**UNITED STATES of America, Appellant,**

v.

**MICROSOFT CORPORATION.**

**UNITED STATES of America**

v.

**MICROSOFT CORPORATION, Appellant.**

**Nos. 95–5037, 95–5039.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 1995.

Decided June 16, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 17, 1995.

---

Joel I. Klein, Deputy Asst. Atty. Gen., U.S. Dept. of Justice, argued the cause for appellant U.S. With him on the briefs were Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan, Robert B. Nicholson, David Seidman and Mark S. Popofsky, Attys., U.S. Dept. of Justice.

Richard J. Urowsky, Sullivan & Cromwell, argued the cause for appellant Microsoft Corp. With him on the briefs were Steven L. Holley, Richard C. Pepperman, II, Andrew C. Hruska, William H. Neukom, David A. Heiner, Jr., James R. Weiss and Donald A. Kaplan, Sullivan & Cromwell. Margaret K. Pfeiffer, Sullivan & Cromwell, entered an appearance.

John H. Chapman argued the cause and filed the briefs for amicus curiae Computer & Communications Industry Ass'n.

Gary L. Reback argued the cause for amici curiae Computer Industry Parties. With him on the briefs were Susan A. Creighton, David A. Killam, Neil M. Nathanson and Irwin R. Gross.

Jeffrey S. Jacobovitz argued the cause for amicus curiae I.D.E. Corp. With him on the

briefs were Mark L. Rosenberg and Alan A.B. McDowell.

Before: EDWARDS, Chief Judge; SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion PER CURIAM.

SILBERMAN, Circuit Judge:

Section 16(e) of the Antitrust Procedures and Penalties Act, known as the Tunney Act, requires the district court to determine whether entry of an antitrust consent decree is "in the public interest." 15 U.S.C. § 16(e) (1988). In this case, the district court refused to enter a proposed consent decree the Antitrust Division of the Department of Justice negotiated with Microsoft Corporation. We conclude that the proposed consent decree is in the public interest, and that the district court exceeded its authority in concluding to the contrary. We therefore reverse and remand with instructions to enter an order approving the decree.

## I.

Microsoft dominates the world market for operating systems software that runs on IBM-compatible personal computers ("PCs"). Operating systems software controls the operation of the computer and manages the interaction between the computer's memory and attached devices such as keyboards, printers, display screens and disk drives. In 1990, the Federal Trade Commission began investigating Microsoft's acquisition and maintenance of monopoly power in that market. When faced with the decision whether to file a complaint against Microsoft, however, the Commission deadlocked 2–2, thus suspending the agency's investigation.

The Antitrust Division of the Department of Justice then initiated its own investigation of Microsoft (apparently a rather rare occurrence), using the FTC's extensive investigatory file as its starting point. The Department issued 21 Civil Investigative Demands to Microsoft and third parties, reviewed one million pages of documents, and conducted over 100 interviews. The Department also deposed 22 persons, including Microsoft Chairman Bill Gates.

In July 1994, the Department filed a civil complaint under the Sherman Act, 15 U.S.C. §§ 1 and 2 (1988), charging Microsoft with unlawfully maintaining a monopoly of operating systems for IBM-compatible PCs and unreasonably restraining trade of the same through certain anticompetitive marketing practices.

The key anticompetitive practice against which the complaint is aimed is Microsoft's use of contract terms requiring original equipment manufacturers ("OEMs") to pay Microsoft a royalty for each computer the OEM sells containing a particular microprocessor (in this case, an x86 class microprocessor), whether or not the OEM has included a Microsoft operating system with that computer. The practical effect of such "per processor licenses," it is alleged, is to deter OEMs from using competing operating systems during the life of their contracts with Microsoft. The complaint further charges that Microsoft has exacerbated the anticompetitive effect of the per processor licenses by executing long-term contracts with major OEMs, and by requiring minimum commitments and crediting unused balances to future contracts, thereby extending the contract term and creating an economic disincentive for an OEM to install a non-Microsoft operating system.

The other anticompetitive device alleged in the complaint is Microsoft's use of overly restrictive nondisclosure agreements with certain independent software vendors ("ISVs"). Those ISVs provide applications software to run "on top of" Microsoft's operating system, enabling the user to perform a variety of tasks, such as wordprocessing. Microsoft provides those ISVs with advance test versions of its newest operating system so that the ISVs can develop their software to be compatible with that operating system. The government alleged that Microsoft, as a corollary, has imposed nondisclosure agreements on some ISVs which would restrict their ability to work with competing operating systems companies and to develop com-

peting products for an unreasonably long period of time.

The government did not allege and does not contend—and this is of crucial significance to this case—that Microsoft *obtained* its alleged monopoly position in violation of the antitrust laws. The government believes that Microsoft's initial acquisition of monopoly power in the operating systems market was the somewhat fortuitous result of IBM choosing for its PCs the operating system introduced by Microsoft ("MS–DOS"), which, with Microsoft's successful exploitation of that advantage, led Microsoft to obtain an installed base on millions of IBM, and IBM-compatible, PCs.

It is undisputed that the software market is characterized by "increasing returns," resulting in natural barriers to entry. Because the costs of producing software are almost exclusively in its design, marginal production costs are "virtually zero." Professor Arrow, the government's consultant and a Nobel-prize winning economist, described the importance of Microsoft's large installed base in an increasing returns market as follows:

> A software product with a large installed base has several advantages relative to a new entrant. Consumers know that such a product is likely to be supported by the vendor with upgrades and service. Users of a product with a large installed base are more likely to find that their products are compatible with other products. They are more likely to be able successfully to exchange work products with their peers, because a large installed base makes it more likely that their peers will use the same product or compatible products. Installed base is particularly important to the economic success of an operating system software product. The value of the operating system is in its capability to run application software. The larger the installed base of a particular operating system, the more likely it is that independent software vendors will write programs that run on that operating system, and, in this circular fashion, the more valuable the operating system will be to consumers.

In a not uncommon technique, the Department of Justice filed a proposed consent decree along with its complaint, which embodied the Department's and Microsoft's settlement of the case. The consent decree, which essentially tracks the complaint and is effective for 78 months following its entry, prohibits Microsoft from entering into per processor licenses, licenses with a term exceeding one year (unless the customer opts to renew for another year), licenses containing a minimum commitment, and unduly restrictive nondisclosure agreements. To prevent Microsoft from using other exclusionary practices to achieve effects similar to those achieved by the practices challenged in the complaint, the proposed decree also prohibits certain other arrangements such as lump-sum pricing and variants of per processor licensing. The decree applies to Microsoft's most popular operating systems products (MS–DOS, Windows and Windows 95) and successor versions or operating systems marketed as replacement products. The decree does not, however, cover "Windows NT" products, which are designed for sophisticated "high end users" and which do not enjoy a substantial portion of the market for such products.

Pursuant to Section 16(b) of the Tunney Act, 15 U.S.C. § 16(b) (1988), the Department of Justice published the proposed decree in the Federal Register, accompanied by a competitive impact statement, and invited comment. *See* 59 Fed.Reg. 42,845 (1994). Only five comments were received during the statutory period, to which the government responded on October 31, 1994.

At the first substantive status conference on September 29, 1994, the district judge informed the parties that over the summer he had read a book about Microsoft—*Hard Drive*[1]—because he "thought it would be a good idea maybe to know as much about Microsoft as probably they're going to know about me." Much of the ensuing discussion focused on accusations against Microsoft con-

---

**1.** James Wallace & Jim Erickson, *Hard Drive: Bill Gates and the Making of the Microsoft Empire* (1992).

tained in the book. The district judge asked whether the government's lawyers had read the book and whether they had investigated the allegations made by its authors. In particular, the judge focused on the allegation that Microsoft engages in "vaporware," which he described in differing terms but ultimately defined as "the public announcement of a computer product before it is ready for market for the sole purpose of causing consumers not to purchase a competitor's product that has been developed and is either currently available for sale or momentarily about to enter the market." *United States v. Microsoft Corp.*, 159 F.R.D. 318, 334 (D.D.C.1995) (*"Opinion"*).[2] (The judge insisted that even truthful product preannouncements would violate the securities laws, if not the antitrust laws.)

According to the district judge, *Hard Drive* also claimed that Microsoft's own applications developers have unfair access to information about Microsoft's operating systems, giving them an undue advantage over competitors in developing applications software that is compatible with Microsoft's operating systems. The government did not include "vaporware" or unfair access charges in its complaint against Microsoft.

At a subsequent status hearing on November 2, 1994, the district judge again referred to *Hard Drive* and its "vaporware" allegations, noting that the book "does allege some very serious practices," and telling the government that he wanted to be satisfied that the allegations in the book were not true. The Department was instructed to inform interested persons that they had until December 5, 1994 to seek leave to participate in the court's hearing on the consent decree. Only I.D.E. Corporation, which had participated in the comment process, sought leave

to participate in the hearing. But on January 10, 1995, (over a month late and over the objection of both the government and Microsoft), the law firm of Wilson, Sonsini, Goodrich & Rosati, on behalf of three computer industry companies ("Doe Companies"), filed a 96–page memorandum (plus a 215–page appendix) arguing that the proposed consent decree was inadequate because it would not result in increased competition in the operating systems market, nor prevent Microsoft from monopolizing the rest of the software industry. The Doe Companies claimed that because of the unusual "increasing returns" nature of Microsoft's market position, it would be extremely difficult to dislodge Microsoft from its dominant status and return the market to a state of equilibrium, or competition. Moreover, they claimed that Microsoft had the capacity to leverage its installed base in the operating systems market so as to dominate the related markets for applications and other software products. The Doe Companies also attached two documents purporting to show that Microsoft had engaged in "vaporware." [3] Wilson, Sonsini's brief was accompanied by a motion requesting that the district court permit the late filing, and also permit the purported computer industry companies to remain anonymous, asserting "fear" that they would be subject to unexplained retaliation from Microsoft. The district court, without a hearing on the need for or propriety of the Doe Companies' proceeding anonymously, granted the motion over the government's and Microsoft's objections.

On January 18, 1995, the United States filed a motion for entry of the decree (later joined orally by Microsoft at the district court's January 20, 1995 hearing) and attached an affidavit from Professor Arrow. As noted, Professor Arrow agreed with *ami-*

---

**2.** Based on his reading of *Hard Drive*, the district judge initially described "vaporware" as "putting out announcements that are misleading or not true to freeze the competition." When the judge asked Microsoft whether it engaged in "vaporware" so defined, Microsoft stated that such charges are "entirely false." Microsoft did not deny that it preannounced products, but explained in its subsequent filings that such preannouncements do not violate the antitrust laws unless they are knowingly false or misleading when made. The judge rejected Microsoft's position, stating that Microsoft's lawyer "[n]ever told

me that you have this funny little interpretation of vaporware."

**3.** In it submissions to the district court, Microsoft rebutted the claim that the documents evidenced "vaporware" activities. Microsoft also explained that it preannounces products because ISVs need such early notification to begin developing compatible applications software. The district court, however, did not refer to Microsoft's rebuttal in its opinion.

*ci* that in an increasing returns market there is a possibility of monopolization, which may be inefficient; but, he claimed, this process is entirely natural. He specifically rejected the notion that the government should intervene where, as he believed was the case here, the market success of the dominant firm was not the result of anticompetitive practices. Professor Arrow concluded that only artificial barriers, such as the licensing practices addressed in the decree, should be regulated or prohibited.

The next day the district court issued an order identifying issues to be addressed at the hearing scheduled for the following day. The parties were requested to explain why, among other things, the consent decree did not contain provisions that would (1) bar Microsoft from engaging in "vaporware," (2) establish a wall between the development of operating systems software and the development of applications software at Microsoft, and (3) require disclosure of all instruction codes built into operating systems software designed to give Microsoft an advantage over competitors in the applications software market. *See Opinion*, 159 F.R.D. at 326–27 n. 15. The Computer & Communications Industry Association ("CCIA") filed a motion for leave to intervene, or alternatively, to participate as *amicus curiae*.

The district court allowed I.D.E. Corporation, CCIA and the Doe Companies to partic-

ipate in the January 20, 1995 hearing.[4] All three urged disapproval of the decree. The district judge devoted substantial time to questioning counsel about "vaporware" and pressing the government for information regarding its investigation of "vaporware" allegations—information which the government declined to provide on the ground that the such allegations were unrelated to the violations charged in the complaint.[5]

On February 14, 1995, the district court issued an order denying the government's motion to approve the consent decree. The judge stated that he could not find the proposed decree to be in the public interest for four reasons:

> First, the Government has declined to provide the Court with the information it needs to make a proper public interest determination. Second, the scope of the decree is too narrow. Third, the parties have been unable and unwilling adequately to address certain anticompetitive practices, which Microsoft states it will continue to employ in the future and with respect to which the decree is silent. Thus, the decree does not constitute an effective antitrust remedy. Fourth, the Court is not satisfied that the enforcement and compliance mechanisms in the decree are satisfactory.

*Opinion*, 159 F.R.D. at 332.

The judge's understanding of the extent of additional information he "need[ed]" to make

---

**4.** The district court subsequently issued an order denying motions to intervene by I.D.E. Corporation and CCIA but authorizing them to participate under § 16(f)(3) of the Tunney Act, which allows the district court to "authorize full or limited participation in proceedings before the court by interested persons ... in any other manner and extent which serves the public interest as the court may deem appropriate." 15 U.S.C. § 16(f)(3) (1988).

**5.** After the hearing on the consent decree, several *ex parte* submissions were sent to the district judge. First, the Doe Companies submitted a supplement to their brief which contained a redacted exhibit. At the same time the district judge ruled on the motion to approve the consent decree, he granted Microsoft's motion to strike the supplement, but only to the extent that it referred to the redacted exhibit. Then, Apple Computer, Inc. sent to the district judge an *ex parte* letter (with five attached affidavits) accusing Microsoft of anticompetitive practices not

related to those charged in the complaint. The judge ordered that Apple's letter and affidavits be filed, but stated that he did not consider them. *See Opinion*, 159 F.R.D. at 328–29. Finally, Andrew Schulman, a software industry commentator, sent the district judge an *ex parte* letter opposing the consent decree. In his letter, Schulman stated that he had asked his publisher to send to the judge a copy of *Unauthorized Windows 95*, Schulman's latest book. Microsoft states that the judge did not disclose his receipt of the Schulman letter or book and Microsoft did not become aware of the letter's existence until the Doe Companies attached it to their supplemental submission. Upon learning that the materials Schulman sent to chambers had "become an issue in this case," the judge ordered that a facsimile from Schulman be filed. (The order did not refer to Schulman's previous letter opposing the consent decree.) That facsimile indicates that the district judge had returned Schulman's unsolicited book (along with a copy of the district judge's opinion).

the public interest determination under the Tunney Act was quite considerable and was of a character that the government contended was not only outside the scope of the Tunney Act, but was also improper for a judge to seek. The court required at a "minimum":

(1) The broad contours of the investigation *i.e.*, the particular practices and conduct of the defendant that were under investigation along with the nature, scope and intensity of the inquiry;

(2) With respect to such particular practices and conduct, what were the conclusions reached by the Government;

(3) In the settlement discussions between the Government and defendant: (a) what were the areas that were discussed, and (b) what, if any, areas were bargained away and the reasons for their non-inclusion in the decree;

(4) With respect to the areas not discussed at the bargaining table or not bargained away, what are the plans for the Government to deal with them *i.e.*, is the investigation to continue, and, if so, at what intensity, or if the investigation is to be closed, then the Government must explain why it is in the public interest to do so.

*Opinion*, 159 F.R.D. at 332.

The judge's second objection, going to the *scope* of the decree, was predicated on his concern that it does not apply to all of Microsoft's operating systems. The decree, it will be recalled, explicitly excludes from its coverage "Windows NT." In an apparent reference to Microsoft's contention that its product preannouncements do not fit the definition of "vaporware" and do not constitute antitrust violations, the court further noted that "taking into account Microsoft's penchant for narrowly defining the antitrust laws, the Court fears there may be endless debate as to whether a new operating system is covered by the decree." *Id.* at 333.

As to the third point—the essence of the *amici*'s objection—the judge concluded that the decree does not provide an effective antitrust remedy because it does not "pry open" the market to competition, *i.e.*, remedy the monopolist position Microsoft has achieved through supposed illegal means. The judge

was especially concerned that the decree does not address "a number of other anti-competitive practices that from time to time Microsoft has been accused of engaging in by others in the industry." *Id.* at 334. Among such practices were "vaporware," Microsoft's "use[ ] [of] its dominant position in operating systems to give it an undue advantage in developing applications software," and its manipulation of its operating systems to render competing applications software inoperable or more difficult for consumers to use. *Id.* at 334–35.

Finally, the court determined that the consent decree did not oblige Microsoft to adopt sufficient internal compliance mechanisms. Based on its perception that Microsoft had misled the court about whether it engaged in "vaporware," the district court concluded that Microsoft's current staff of "50 or so in-house lawyers, along with its outside retained counsel," were insufficient to monitor the decree adequately. *Id.* at 336.

The United States and Microsoft appeal from the order refusing to enter the decree, asking this court to remand with instructions to enter the decree. Microsoft appeals as well from the order allowing the anonymous participation of the Doe Companies (and CCIA's participation), and asks that the case be remanded to another district court judge because it contends that Judge Sporkin has demonstrated personal bias against the company.

Since both parties to the decree have appealed the district court's order, these consolidated cases present the rare situation in which there is no appellee. Accordingly, we have allowed the Doe Companies, CCIA and I.D.E. Corporation to continue in their roles as *amici*.

## II.

Both the government and Microsoft contend that the district judge vastly exceeded his authority under the Tunney Act, and that as a matter of law they are entitled to the court's entry of the consent decree. Before considering their arguments, however, we are obliged to determine that we have jurisdiction to entertain this appeal. *Amici* con-

tend that we do not. The government (and Microsoft) rely on 28 U.S.C. § 1292(a)(1) (1988), which authorizes interlocutory appeals from orders of the district court "granting, continuing, modifying, refusing or dissolving injunctions...." By refusing to enter the consent decree, the district court, it is argued, has refused to grant an injunction within the meaning of that statute. The leading case on point is *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), where the Supreme Court held that a district court's refusal to enter a consent decree that had the practical effect of denying an injunction was immediately appealable if the order had a "serious, perhaps irreparable, consequence," and could only be "effectually challenged" by immediate appeal. *Id.* at 84, 101 S.Ct. at 996–97, citing *Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 181, 75 S.Ct. 249, 252–53, 99 L.Ed. 233 (1955).

The decree at issue here does, as in *Carson*, call for an injunction: Microsoft would be permanently enjoined from using what the government contends are anticompetitive licensing contracts for its PC operating systems. "Indeed, prospective relief [is] at the very core of the disapproved settlement." *Id.* To be sure, in *Carson* the district court indicated its disapproval of the relief sought by a civil rights plaintiff because it was arguably too extensive; whereas here, the district judge is objecting because the relief does not appear to him to go far enough. *Amici* thus describe the district judge's order as a refusal to *limit* the potential relief available rather than a refusal to grant injunctive relief. That seems to us to be only a deft semantic characterization. It matters not whether a district judge objects to the injunctive relief as too strong or not strong enough: in either case, the judge is refusing to grant the injunction except under conditions that the parties will not accept. Nor is there any doubt in this case that the district judge had reached a firm determination. His order and opinion make that quite clear.

*Amici* nevertheless contend that the government has not shown any "serious consequences" that justify the interlocutory appeal. The government, it is argued, is only concerned about its settlement statistics. We disagree. The district court's refusal to enter the decree puts the government to a difficult, perhaps Hobson's, choice. It must either drop its case against Microsoft entirely and allow Microsoft to continue to engage in practices which the government believes are anticompetitive; or, it is compelled to litigate and presumably proceed under a vastly expanded complaint that in effect asserts that Microsoft engaged in activities which the government does not believe are illegal (*i.e.*, achieving its dominant position in the first place), or seeks remedies which the government does not believe are justified by the evidence. Moreover, as the government points out, the consent decree is part of a negotiated settlement. A district judge's refusal to accept the decree—particularly upon the grounds advanced—cannot but have enormous practical consequences for the government's ability to negotiate future settlements. *Cf. Carson*, 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14 (order refusing to enter consent decree would undermine Title VII's strong preference for encouraging voluntary settlement of employment discrimination claims). The Tunney Act was not intended to create a disincentive to the use of the consent decree. *See, e.g.*, S.Rep. No. 298, 93d Cong., 1st Sess. 7 (1973) ("The [Senate Judiciary] Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool."); H.Rep. No. 1463, 93 Cong., 2d Sess. 6 (1974) (expressing intent to preserve the policy of the antitrust laws to encourage settlement by consent decree), *reprinted in* 1974 U.S. Code Cong. & Admin. News 6535, 6536–37. We conclude, therefore, that the government easily meets the *Carson* standard. We have jurisdiction over the appeal.

Microsoft has also appealed the judge's refusal to enter the consent decree. Actually, in this situation, it is doubtful if we would have jurisdiction unless both parties to the decree appealed. Certainly if the government accepted the district judge's view of the case and wished to proceed to trial, the propriety of the judge's order would be moot; and, if Microsoft was no longer willing to agree to the government's conditions, the

issue would similarly be moot.[6] Therefore, both parties must be entitled to appeal the district judge's refusal to enter the decree. Microsoft in addition appeals one order that the government does not: the order allowing participation by the Doe Companies and CCIA. Microsoft asserts that the district court erred in permitting the Doe Companies to participate anonymously.

Microsoft argues that the order fits within the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), which permits interlocutory review of collateral orders "that are conclusive, that resolve important questions completely separate from the merits, and that would render such important questions effectively unreviewable on appeal from final judgment in the underlying action." *Digital Equip. Corp. v. Desktop Direct, Inc.*, — U.S. —, — — —, 114 S.Ct. 1992, 1995–96, 128 L.Ed.2d 842 (1994). Normally, of course, an order permitting or denying *amici* participation could not qualify under the doctrine. Here, however, the Doe Companies, the prime opponents of the decree and the most vigorous accusers of Microsoft, appeared anonymously. That is quite a departure from normal procedure, and raises profound questions of fundamental fairness and perhaps even due process. It might well be that a party forced to confront an anonymous plaintiff (or the functional equivalent of a plaintiff acting as an *amici*) could suffer injury that might not be redressable in an ultimate appeal. Anonymity may well confer a kind of immunity which permits a plaintiff to hurl rhetorical weapons that could cause a unique kind of harm not faced in ordinary litigation. *Cf. McIntyre v. Ohio Elections Comm'n*, — U.S. —, —, 115 S.Ct. 1511, 1524, 131 L.Ed.2d 426 (1995) (holding that Ohio election law forbidding all anonymous political leafletting violated the First Amendment but noting that "[t]he right to remain anonymous may be abused when it shields fraudulent conduct"). However, in our view, it is unnecessary to decide whether Microsoft would have been entitled to appeal

this order independently. Since we have concluded that we have jurisdiction over the basic appeal, the district judge's order permitting the *amici* to participate is not really interlocutory. It comes before us as part and parcel of the record in this case.

## III.

Appellants contend that the district judge misinterpreted the Tunney Act—indeed interpreted that statute so as to raise serious questions regarding its constitutionality—by basing his rejection of the decree on considerations which implicate the executive branch's prosecutorial discretion. The thrust of the judge's concerns were directed to his dissatisfaction with the framework of the complaint fashioned by the Department. He thought it much too modest to deal with the imperfections in the relevant market and their cause—at least as he perceived them. Appellants contend that the judge did not simply make the proper inquiry into whether the decree was appropriate to the complaint, but instead asked whether the complaint itself was adequate. By doing so, it is argued, the judge improperly intruded on the government's prosecutorial role. The judge's demand that he be informed of the contours of the investigation, the settlement discussions, and the government's future investigative plans, indicates that the judge impermissibly arrogated to himself the President's role "to take care that the laws be faithfully executed."

*Amici*, defending the judge's order, argue that it merely focused on whether the remedy provided in the decree was adequate to the allegations in the complaint. Appellants respond, however, that even to the extent that the judge's order is directed to the adequacy of the remedy to the allegations actually charged—which they insist is only a minor theme in the judge's opinion—the judge nevertheless exceeded his authority. Under our own precedent dealing with uncontested modifications of a consent decree, we have repeatedly said that a district judge

---

6. In a case in which only the defendant appealed (the government's position is not apparent) the Ninth Circuit concluded that it lacked jurisdiction. *Equal Employment Opportunity Comm'n v.*

*Pan American World Airways*, 796 F.2d 314 (9th Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 829 (1987).

must approve such modifications so long as the proposal falls "within the *reaches* of the public interest." *United States v. Western Elec. Co.,* 900 F.2d 283, 309 (D.C.Cir.1990) (*"Triennial Review Opinion"*) (emphasis in original) (quoting *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981), in turn quoting *United States v. Gillette Co.,* 406 F.Supp. 713, 716 (D.Mass.1975)).

At the heart of this case, then, is the proper scope of the district court's inquiry into the "public interest." Is the district judge entitled to seize hold of the matter— the investigation into the putative defendant's business practices—and decide for himself the appropriate combined response of the executive and judicial branches to those practices? With respect to the specific allegations in the government's complaint, may the court interpose its own views of the appropriate remedy over those the government seeks as a part of its overall settlement? To be sure, Congress, in passing the Tunney Act, intended to prevent "judicial rubber stamping" of the Justice Department's proposed consent decree. H.R.REP. No. 1463, *supra,* at 8, *reprinted in* 1974 U.S. CODE CONG. & ADMIN. NEWS at 6538. The Court was to "make an independent determination as to whether or not entry of a proposed consent decree [was] in the public interest." S.REP. No. 298, *supra,* at 5. Yet, Congress did not purport to alter antitrust precedent applying the public interest in reviewing consent decrees. H.R.REP. No. 1463, *supra,* at 11, *reprinted in* 1974 U.S. CODE CONG. & ADMIN. NEWS at 6539. The difficulty with that stated purpose is that there was virtually no useful precedent—certainly none in which an appellate court had approved a trial court's rejection of a consent decree as outside the public interest. *Cf. Antitrust Procedures and Penalties Act: Hearings on S.782 and S.1088 Before the Subcomm. on Antitrust and Monopolies of the Senate Comm. on the Judiciary,* 93d Cong., 1st

Sess. 92 (1973) ("Senate Hearings") (Statement of Thomas E. Kauper, Assistant Attorney General, Antitrust Division, Dept. of Justice) ("[E]xcept in cases where a previous judicial mandate is involved and the consent decree fails to comply with that mandate, or where there is a showing of bad faith or malfeasance, the courts have allowed a wide range of prosecutorial discretion.").

Although the statute does not give specific guidance, it does speak in rather broad terms. In determining whether the decree is in the public interest, the district court is authorized to "consider":

> (1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;
>
> (2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e) (1988).

The Ninth Circuit observed (in a case in which the *defendant* wished to withdraw from the decree) that that language "suggests that a court may, and perhaps should, look beyond the strict relationship between complaint and remedy in evaluating the public interest." *Bechtel Corp.,* 648 F.2d at 666. But it went on to determine that "we cannot agree that a district court should engage in an unrestricted evaluation of what relief would best serve the public." *Id.*[7]

The most prominent post-Tunney Act consent decree, the AT & T consent decree, was modified by the district judge in several respects in accordance with his views of the public interest and, although both the government and AT & T acquiesced, non-parties

---

7. The Ninth Circuit subsequently split as to whether that language did or did not authorize a district court to look behind and beyond the complaint to judge the public interest. *United States v. BNS, Inc.,* 858 F.2d 456 (9th Cir.1988).

The majority thought a district judge could look to non-antitrust factors, but not to antitrust concerns in markets other than those alleged in the complaint. *Id.* at 462–63.

to the decree were allowed to intervene for purposes of appealing the district judge's public interest determination. It does not appear that any of the appellants challenged the constitutionality of the Tunney Act, but Justice Rehnquist, speaking for Chief Justice Burger and Justice White, nevertheless published a dissent from the order affirming the district court's entry of the decree. *See Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The dissent expressed grave doubt as to the Act's constitutionality because without a judicial finding of illegality (a consent decree is, of course, a settlement), the statute does not supply a judicially manageable standard for review of the decree, *id.* at 1004, 103 S.Ct. at 1242, and the considerations that led the Department of Justice to settle are not amenable to judicial review, *id.* at 1005–06, 103 S.Ct. at 1243–44. *See also Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). For instance, a settlement, particularly of a major case, will allow the Department of Justice to reallocate necessarily limited resources.

■ The government, cautioning us as to the constitutional difficulties that inhere in this statute, urges us to flatly reject the district judge's efforts to reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made. We agree. Although the language of section 16(e) is not precise, we think the government is correct in contending that section 16(e)(1)'s reference to the alleged violations suggests that Congress did not mean for a district judge to construct his own hypothetical case and then evaluate the decree against that case. Moreover, in section 16(e)(2), the court is authorized to consider "the public benefit ... of the determination of the issues at trial." Putting aside the perplexing question of how the district judge could insure a trial if the government did not wish one, "the issues" referred to must be those formulated in the complaint. Congress surely did not contemplate that the district judge would, by reformulating the issues, effectively redraft the complaint himself. We therefore dismiss the claim that the last line in section 16(e)(1), the catchall clause allowing the district court to

entertain "any other considerations bearing upon the adequacy of such judgment," authorizes the wide-ranging inquiry the district court wished to conduct in this case. That language recognizes, *inter alia,* that a consent decree might well do unexpected harm to persons other than those "alleging specific injury from the violations set forth in the complaint." 15 U.S.C. § 16(e)(2) (1988). And the district court might ponder those sort of concerns in determining whether to enter the judgment.

■ To be sure, the Act also authorizes the district judge to "take testimony of Government officials ... as the court may deem appropriate." 15 U.S.C. § 16(f)(1) (1988). We do not read this language, however, to authorize the district judge to seek the kind of information concerning the government's investigation and settlement negotiations that he wished to obtain here. Even when a court is explicitly authorized to review government action under the Administrative Procedure Act, "there must be a strong showing of bad faith or improper behavior" before the court may "inquir[e] into the mental processes of administrative decisionmakers." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Here, the district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself. It is unnecessary to consider whether the district court might have broader authority to inquire into the Department's deliberations, even though not authorized to "review" the Department's action, if there were a credible showing of bad faith. *See* Senate Hearings, *supra,* at 92. There is no such claim here.

The district court was troubled that if its review were limited to the market and practices within that market against which the complaint was directed, the government could, by narrow drafting, artificially limit the court's review under the Tunney Act. *See Opinion,* 159 F.R.D. at 332. We think, with all due respect, that the district court put the cart before the horse. The court's authority to review the decree depends en-

tirely on the government's exercising its prosecutorial discretion by bringing a case in the first place.

■ That brings us to *amici*'s contention that the district court was justified in rejecting the decree as providing inadequate remedies, even if the court was barred from reaching beyond the complaint to examine practices the government did not challenge. The district judge (and *amici*) believed that the decree would not "effectively pry open to competition a market that has been closed by defendant['s] illegal restraints." *Opinion,* 159 F.R.D. at 333 (quoting *United States v. American Telephone & Telegraph Co.,* 552 F.Supp. 131, 150 (D.D.C.1982) (in turn quoting *International Salt Co. v. United States,* 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947)), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983)). The judge was especially concerned that Professor Arrow had not explained "how the decree remedies the monopolist position Microsoft has achieved through alleged illegal means *in an increasing returns market." Id.* at 334 (emphasis in original). And he urged that the decree should address "a number of other anticompetitive practices that from time to time Microsoft has been accused of engaging in by others in the industry," such as "vaporware." *Id.*

■ This argument, it seems to us, merely recasts the district court's order to make it appear less unorthodox. The complaint did not allege—because the government did not believe it was true—that Microsoft's dominant market position resulted from illegal means. The district court and *amici* would have it be otherwise, but neither have the power to force the government to make that claim. And since the claim is not made, a remedy directed to that claim is hardly appropriate. Of course, such reasoning applies *a fortiori* to discrete practices such as "vaporware," that the government does not assert are antitrust violations and which bear no relationship to the practices against which the complaint is directed. Even where the government has proved antitrust violations at trial, the remedies must be of the "same type or class" as the violations, and the court is

not at liberty to enjoin "all future violations of the antitrust laws, however unrelated to violations found by the court." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 132–33, 89 S.Ct. 1562, 1581–82, 23 L.Ed.2d 129 (1969) (citations omitted).

If the essential dispute between *amici* and appellants were more narrowly cast as objections to the remedies sought, the district judge would still not be empowered to reject them merely because he believed other remedies were preferable. As we have said in the context of reviewing agreed upon modifications of a consent decree:

> The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities "is the one that will *best* serve society," but only to confirm that the resulting settlement is " 'within the *reaches* of the public interest.' "

*Triennial Review Opinion,* 900 F.2d at 309 (emphasis in original) (citing and quoting *Bechtel,* 648 F.2d at 666, in turn quoting *Gillette,* 406 F.Supp. at 716). Thus, a court should not reject an agreed-upon modification unless "it has exceptional confidence that adverse antitrust consequences will result—perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an administrative agency." *United States v. Western Elec. Co.,* 993 F.2d 1572, 1577 (D.C.Cir.) (*"Triennial Review Remand Opinion "), cert. denied,* —— U.S. ——, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993).

■ The *Triennial Review* cases, dealing with the administration of the AT & T consent decree, involve a decree the oversight of which had been the business of a district judge for several years. In some respects, the parties' request for approval of a modification to a decree is akin to a request for entry of an initial proposed decree but, in other respects, it is different. In the latter situation, it seems to us that the district judge must be even more deferential than in the former. As Justice Rehnquist noted in *Maryland v. United States,* when a consent decree is brought to a district judge, because it is a settlement, there are no *findings* that the defendant has actually engaged in illegal

practices. *See* 460 U.S. at 1004, 103 S.Ct. at 1242 (Rehnquist, J., dissenting). It is therefore inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial. Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted.[8] We think the district judge's criticism of Microsoft for declining to admit that the practices charged in the complaint actually violated the antitrust laws was thus unjustified. *See Opinion,* 159 F.R.D. at 337; H.R.REP. No. 1463, *supra,* at 6 ("Ordinarily, defendants do not admit to having violated the antitrust or other laws alleged as violated in complaints that are settled."), *reprinted in* 1974 U.S. CODE CONG. & ADMIN. NEWS 6535, 6536–37. The important question is whether Microsoft will abide by the terms of the consent decree regardless of whether it is willing to admit wrongdoing.

After a district judge has administered a consent decree for some period of time—as is true regarding the AT & T decree—it might be thought that he would gain at least some familiarity with the market involved, and therefore the lack of an initial trial is, at least marginally, less of an inhibition. But when the proposed decree comes to a district judge in the first instance as a settlement between the parties that may well reflect weaknesses in the government's case, the district judge must be even more deferential to the government's predictions as to the effect of the proposed remedies than he would be when a modification request is presented, as in the AT & T cases, long after entry.

■ Giving due respect to the Justice Department's perception of the market struc-

ture and its view of the nature of its case, we think the district judge was obliged to conclude that the remedies were not so inconsonant with the allegations charged as to fall outside of the "reaches of the public interest." The district court understandably questioned the government as to why the decree did not forbid Microsoft from using the alleged anticompetitive licensing practices with respect to all of Microsoft's operating systems (in particular, Windows NT products). But the government explained that Windows NT products do not have "a significant share of a relevant market at this time."

It might well be that the decree would be strengthened if Windows NT were explicitly covered (it could also be that this was a concession the government made in bargaining), but that is of no great moment. It is undisputed that Windows NT does not have a dominant market position, and Professor Arrow assured the court that the decree "appropriately addresses and remedies the anticompetitive effects of the practices challenged in the complaint." It is not for us (or the district court) to decide whether Professor Arrow is correct. "The quality of [his] presentation[ ] is enough ... to establish an ample factual foundation for the judgment call made by the Department of Justice and to make its conclusion reasonable." *Triennial Review Remand Opinion,* 993 F.2d at 1582.[9]

■ A district judge pondering a proposed consent decree understandably would and should pay special attention to the decree's clarity. The government may be entitled to rather broad discretion to settle with the defendant within the reaches of the public interest, but the district judge who must

---

8. On this point, we disagree with *Gillette,* 406 F.Supp. at 715–16, in which the district court stated that "the decree is to be tested on the basis of the relief provided, on the assumption that the government would have won."

9. *Amicus* I.D.E. Corporation (which refers to itself as "IDEA") contends that the decree is inadequate because it does not require Microsoft to disgorge unused minimum commitment payments that IDEA made pursuant to its licensing agreement with Microsoft. In other words, IDEA asserts generally that the remedy should

provide retroactive relief and that it should be tailored to meet IDEA's particular situation. While the district court may inquire into whether a decree will result in any positive injury to third parties, *see* 15 U.S.C. § 16(e)(2) (1988), in the absence of such injury, it should not reject an otherwise adequate remedy simply because a third party claims it could be better treated. The decree does not preclude IDEA from bringing its own private antitrust suit against Microsoft to gain the specific relief it seeks.

preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable. We therefore think the district judge was on solid ground in, at least, inquiring as to the product lines covered in the decree. *Amici* suggest that in this respect the decree is ambiguous and that the district judge's refusal to accept it can be justified on this alternative ground. The decree provides that "successor versions of or replacement products marketed as replacements for the [covered products]" are covered by the decree. But, as noted, Windows NT is specifically excluded. What would happen, *amici* ask, if Windows NT were somehow to be made to serve as a replacement or successor to MS–DOS or Windows products covered by the decree? The government contends (and Microsoft does not dispute) that in such an unlikely event Windows NT would be covered as a successor to the covered products. We think that is the logical interpretation of the decree, and therefore perceive no continuing ambiguity.[10] In any event, the district judge's concern was not primarily ambiguous language, but was rather his perception that Microsoft had a "penchant for narrowly defining the antitrust laws," and that therefore "endless debate" might ensue "as to whether a new operating system is covered by the decree." *Opinion,* 159 F.R.D. at 333. This observation apparently stems from the "vaporware dispute" between Microsoft's counsel and the district judge, as well as from Microsoft's unwillingness to concede that the practices covered by the decree violated the antitrust laws. As we have already noted, the judge's conclusions about Microsoft's behavior past or future are, *on this record,* unwarranted.

 Similarly, we would expect a district court to pay close attention to the compliance mechanisms in a consent decree. In this case, the lack of an adequate compliance mechanism was the final ground the district judge advanced for rejecting the decree.

The district judge appeared to be concerned, however, with a great deal more than the decree. Although the court recognized that Microsoft employed "50 or so in-house lawyers, along with its outside retained counsel," all available to monitor compliance, he indicated that the company ought to be obliged to employ an internal compliance officer, such as a private inspector general. The judge, in accordance with his previously described views of Microsoft's business practices and positions taken in court, believed the decree should seek to fundamentally alter Microsoft's culture, perhaps even reduce its competitive zeal. Suffice it to say, those objectives exceed any legitimate concerns about actual compliance with the decree.

\* \* \* \* \* \*

When the government and a putative defendant present a proposed consent decree to a district court for review under the Tunney Act, the court can and should inquire, in the manner we have described, into the purpose, meaning, and efficacy of the decree. If the decree is ambiguous, or the district judge can foresee difficulties in implementation, we would expect the court to insist that these matters be attended to. And, certainly, if third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate. But, when the government is challenged for not bringing as extensive an action as it might, a district judge must be careful not to exceed his or her constitutional role. A decree, even entered as a pretrial settlement, is a judicial act, and therefore the district judge is not obliged to accept one that, on its face and even after government explanation, appears to make a mockery of judicial power. Short of that eventuality, the Tunney Act cannot be interpreted as an authorization for a district judge to assume the role of Attorney General.

Accordingly, the case is remanded with instructions to enter the proposed decree.

---

**10.** *Amici* also contend without explanation that the decree contains a "loophole" by which a next-generation operating system can be taken outside the scope of the decree if Microsoft sells it "bundled" with an applications program. We perceive no interpretation of the decree's definition of covered products which would allow such a result.

PER CURIAM:

█ Microsoft requests that this case be remanded to another district court judge because Judge Sporkin has demonstrated actual bias against the company. We do not lightly conclude that a bias claim has been made out. *See SEC v. First City Financial Corp.,* 890 F.2d 1215, 1221–23 (D.C.Cir.1989). But both the recusal statute, 28 U.S.C. § 455(a) (1988),[1] and our general supervisory power to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106 (1988), allow us to reassign this case to a different judge on remand. *See Liteky v. United States,* —— U.S. ——, —— – ——, 114 S.Ct. 1147, 1156–57, 127 L.Ed.2d 474 (1994). To do so, we need not find actual bias or prejudice, but only that the facts "might reasonably cause an objective observer to question [the judge's] impartiality." *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 865, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988).[2]

We are deeply troubled by several aspects of the proceedings in district court. As we have made clear, it was error for the judge to inquire into allegations outside the complaint. That a judge commits error, of course, is by itself hardly a basis for imputing bias or even the appearance of partiality. But a review of the transcripts in this case makes it patently obvious that the reason for the judge's broad-ranging inquiries was his acceptance of the accusations in the book *Hard Drive.* The district judge's reliance on that book contaminated the entire Tunney Act review. Perhaps the most serious example was the district judge's insistence on dwelling on the book's charges regarding "vaporware." After reviewing the transcripts and the district judge's opinion, an objective observer is left with the overall impression that the district judge had formed an opinion about Microsoft's practices based on *Hard Drive,* and therefore was unwilling to accept a consent decree that did not address "vaporware" (as well as various other allegations made in the

book). The following colloquy is just one of many that leaves this impression:

THE COURT: You see, what you have to explain to me is why not if these other practices—say while we're cleaning up this mess, why don't we also take care of—you must agree that vaporware is a problem. You must agree that to give Microsoft an advantage because their applications people have access to their operation people—

MS. BINGAMAN (for the government): Let me go to that.

THE COURT: In other words, it would seem to me to say, hey, look, we don't want to come back and sue you next week. We don't want to come back and sue you every Monday and Tuesday. You ought to clean up this mess. They've got 50 lawyers there. They can make sure that they're doing it.

MS. BINGAMAN: Here's the answer, Your Honor. If I had a case that I could file today on those practices, I would file it. I've said that repeatedly.

THE COURT: Well, I know, *but you don't have to have a case.*

The book's allegations are, of course, not evidence on which a judge is entitled to rely, nor are those unsworn allegations even grounds upon which to interrogate the government about its position with respect to those allegations.

We are similarly distressed by the district judge's decision to allow the Doe Companies to proceed anonymously. We are not aware of any case in which a plaintiff was allowed to sue a defendant and still remain anonymous to that defendant. Such proceedings would, as Microsoft argues, seriously implicate due process. Indeed, parties to a lawsuit must typically openly identify themselves in their pleadings to "protect[ ] the public's legitimate interest in knowing all of the facts involved, including the identities of the parties." *Doe v. Frank,* 951 F.2d 320, 322 (11th Cir.1992). "Basic fairness dictates that those among the defendants' accusers who wish to participate

---

1. Section 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his *impartiality* might reasonably be questioned." (emphasis added).

2. Although *Liljeberg* was decided in the context of the recusal statute, 28 U.S.C. § 455(a), it guides our analysis under 28 U.S.C. § 2106.

... as individual party plaintiffs must do so under their real names." *Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979).

Although it is within the discretion of the district court to grant the "rare dispensation" of anonymity against the world (but not the plaintiff), even in that situation the court has "a judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir.1993). As part of this inquiry, the court should take into account the risk of unfairness to the opposing party, *Wynne & Jaffe*, 599 F.2d at 713, as well the "customary and constitutionally-embedded presumption of openness in judicial proceedings." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir.1981). Nor are we aware of any case in which an *amicus*—a friend of the court—has been permitted to remain anonymous. One might think that such a situation would be a contradiction in terms. But these *amici* are in any event apparent adversaries of Microsoft, so they should be no more entitled to proceed anonymously than if they were plaintiffs.

Here, the district judge accepted the Doe Companies' claims of fear of retaliation from Microsoft, without inquiry and apparently with no consideration of what an extraordinary break with precedent such an action implied. *See Opinion*, 159 F.R.D. at 329. The judge did not fulfill his duty to consider the impact of anonymity on the public interest in knowing the identities of the participants in this proceeding, nor did he consider possible unfairness to Microsoft.

The language of the Tunney Act relied upon by the district judge—which permits a district court to authorize "participation in any other manner and extent which serves the public interest," 15 U.S.C. § 16(f) (1988)—does not authorize his cursory dismissal of Microsoft's (and the government's) protests. The district judge may not rely on that language to abandon all precedent governing accepted process in federal courts. The public interest, after all, includes an interest in fairness to all parties. While "judicial rulings alone almost never constitute valid basis for a bias or partiality motion," *Liteky*, —— U.S. at ——, 114 S.Ct. at 1157, the district judge's failure to accord any weight to Microsoft's interests in making its determination adds to the appearance of bias in this case.

We are also concerned by the district judge's acceptance of *ex parte* submissions. *See, infra*, n. 5. "*Ex parte* communications generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires 'a reasonable opportunity to know the claims of the opposing party and to meet them.'" *In re Paradyne Corp.*, 803 F.2d 604, 612 (11th Cir.1986) (quoting *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938)). *See also Code of Judicial Conduct for United States Judges*, Canon 3(A)(4) (a judge "should ... neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding"). Although the district judge stated that he did not consider the *ex parte* submissions of the Doe Companies or Apple Computer, Inc., *see Opinion*, 159 F.R.D. at 327–28, he allowed the latter to be filed, and with respect to the former, he suggested that the government should consider the redacted material "and if it believes such information is pertinent to this case, on notice to defendant, it may request the Court to reopen these proceedings so the information appropriately may be considered." *Id.* at 327–28 n. 16. We think the appropriate course would have been simply to refuse to accept any *ex parte* communications.

Finally, we note that the district judge made several comments during the proceedings which evidenced his distrust of Microsoft's lawyers and his generally poor view of Microsoft's practices. *See, e.g., Opinion*, 159 F.R.D. at 336 ("This is the same group [of lawyers] that has advised its client that 'product preannouncements' to impede competition is proper behavior."); *id.* at 338 ("Microsoft, a rather new corporation, may not have matured to the position where it understands how it should act with respect to the public interest and the ethics of the market place."). These comments arose out of the district court's misguided focus on

"vaporware" and Microsoft's other alleged misdeeds, none of which were charged in the complaint.

The combined effect of the foregoing is to cause a reasonable observer to question whether Judge Sporkin "would have difficulty putting his previous views and findings aside" on remand. *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir.1989). Accordingly, we will remand the case to the chief judge of the district court, with instructions that it be assigned to another district court judge.