**UNITED STATES of America,**
**Plaintiff,**

v.

**ALCOA, INC., et al, Defendants.**

**Civil Action No. 2000–954(RMU).**

United States District Court,
District of Columbia.

July 10, 2001.

Mark S. Hegedus, Andrew K. Rosa, U.S. Department of Justice, Washington, DC, for plaintiff.

Mark Leddy, David Irving Gelfand, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for defendants.

### *MEMORANDUM OPINION*

URBINA, District Judge.

**Accepting the Consent Decree and Entering Final Judgment**

### I. Introduction

This antitrust case comes before the court on a motion by the United States for

entry of final judgment with respect to a proposed consent decree. The issue before the court is whether the proposed consent decree is in "the public interest," as contemplated by the Tunney Act, 15 U.S.C. § 16(e). After careful consideration of the parties' submissions and the applicable law, the court concludes that the consent decree proposed by the government, with no opposition by the defendants, is in "the public interest." For the reasons stated below, the court grants the plaintiff's motion, accepts the consent decree, and orders the entry of final judgment.

## II. Procedural History

On May 3, 2000, the United States filed a complaint pursuant to Title 15 U.S.C. § 25, alleging that the proposed merger between Alcoa, Inc. and Reynolds Metal Co. would, if consummated, violate Section 7 of the Clayton Act, 15 U.S.C. § 18 *et seq.* Specifically, the government alleged that unless restrained, the merger would eliminate actual and potential competition between Alcoa and Reynolds; substantially lessen competition in the production and sale of aluminum; and increase prices and decrease the amounts of smelter grade and chemical grade alumina. *See* Compl. at 9–10.

On May 12, 2000, shortly after the filing of the complaint, the parties moved for a "hold separate stipulation order" as well as a "conditional and provisional final judgment," which the court entered on the same day. Four days later, on May 16, 2000, after consulting with both parties via telephone conference, the court vacated the conditional and provisional final judgment so as to allow the parties to satisfy all the relevant provisions of Title 15 U.S.C. § 16(b). This section requires that the following documents be filed with the court and published in the Federal Regis-

ter: a report pursuant to 15 U.S.C. § 16(g); a competitive impact statement; a response to public comments; and a certificate of compliance with provisions of the Antitrust Procedures and Penalties Act (or "Tunney Act"). Having complied with these provisions, the United States now moves for acceptance of the consent decree and entry of final judgment.

## III. Background

■ Alcoa, Inc. is the largest aluminum company in the world. *See* Compl. ¶ 1; Competitive Impact Statement ("CIS") at 3. In 1999, Alcoa had revenues of more than $16 billion. *See* CIS at 3. Alcoa engages in all states of aluminum production, including mining raw aluminum ore ("bauxite"), refining bauxite into alumina powder, smelting alumina into metal ingots, and turning the metal ingots into end products. *See id.* Alcoa owns alumina factories in Western Australia, Brazil, Spain, the U.S. Virginia Islands, and Texas. *See id.* Alcoa also manages the operations of and has ownership interests in three alumina refinery joint ventures in Suriname, Brazil and Jamaica. *See id.*

Reynolds Metal Co. is the second largest aluminum company in the United States and the third largest in the world. *See* Compl. ¶ 1; CIS at 4. In 1999, Reynolds had revenues of more than $4.6 billion. *See* CIS at 4. Reynolds engages in all stages of aluminum production and, like Alcoa, owns interests in facilities around the world. *See id.* On August 18, 1999, Alcoa and Reynolds agreed that Alcoa would acquire Reynolds by exchanging each outstanding share of Reynolds common stock for 1.06 shares of Alcoa common stock, a transaction valued at $5 billion. *See* Compl. ¶ 8. This merger would create a single, fully integrated company engaged in all stages of aluminum production.

Aluminum production yields two products, smelter grade alumina ("SGA") and chemical grade alumina ("CGA"),[1] both of which are highly concentrated markets. The government alleges that the proposed merger will create monopoly power for Alcoa in both the SGA and CGA markets. *See* Compl. ¶¶ 3–4. The government further alleges that the creation of this monopoly power violates Section 7 of the Clayton Act, which provides that "[n]o person engaged in commerce ... shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... [where] the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly." *See* 15 U.S.C. § 18.

According to the government, the proposed merger will combine Alcoa's existing 29 percent of the world's SGA production with Reynolds's 9 percent, bringing the new company's total control of world SGA production to 38 percent. See Compl. ¶¶ 16, 19. This percentage control of world production, in conjunction with the highly inelastic demand and lack of existing substitutes, gives Alcoa "the incentive and ability to exercise market power unilaterally by reducing its output in the SGA market." *See id.* ¶ 19. In addition, the government contends that natural barriers, such as high refinery start-up costs and lengthy building times, prevent entry into the SGA sale and production markets. For these reasons, the government has sought to impose certain conditions on the merger.

While the merger will have a substantial effect on the world SGA market, its impact on the CGA market will be felt much closer to home. In the United States, there are only five producers of CGA currently operating, with the top four companies accounting for more than 90 percent of the production. *See id.* ¶ 30. Alcoa and Reynolds, respectively the first and third largest producers, account for 59 percent of the U.S. production of CGA. *See id.* ¶ 32. The combination of the two companies effectively removes one of the producers from an already highly concentrated market[2] and places a substantial majority of CGA production in the hands of a single corporation. The government alleges that because of the high quantity of consumer goods that utilize CGA, any change in price that results from Alcoa's market-share influence will have a negative impact on consumers that cannot be offset by any other foreign or domestic source. *See* Compl. ¶¶ 27–28.

In response to these economic concerns, the United States and Alcoa negotiated certain matters that would allow the merger to take place without significantly increasing the concentration in SGA and CGA markets. *See* Proposed Final Judgment at 1. The result was to have Alcoa divest some of the production plants which it obtained in the merger, thereby creating new companies and allowing them entry

---

1. Smelter grade alumina is used to produce aluminum ingots, while chemical grade alumina is used as an ingredient in various consumer products. *See* Compl. ¶ 3.

2. The domestic market for CGA production currently has a Herfindahl Hirschman Index ("HHI") of 2722. *See* Compl. ¶ 31. The HHI is a measure of market concentration derived from an analysis of the number of firms in a given market and their respective market share. An HHI of 1800 or more is considered a highly concentrated market. *See id.,* App. A. According to the government, the merger would cause concentration in the domestic CGA market to increase 1500 points from 2722 to 4222. *See* Compl. ¶ 31. According to the Federal Trade Commission's 1992 Horizontal Merger Guidelines, transactions that increase the HHI number by more then 100 points in highly concentrated markets raise antitrust concerns. *See id.,* App. A.

into the markets at substantially lower costs for the express purpose of competing with Alcoa. *See* CIS at 2. The parties thus have consented to a divestment strategy and now seek to have the court approve the agreement and enter final judgment. *See* Proposed Final Judgment at 1.

## IV. Analysis

The Tunney Act instructs the court to review consent judgments proposed by the United States to "determine that the entry of such judgment is in the public interest." *See* 15 U.S.C. § 16(g). In making this determination the court may consider the following factors:

(1) the competitive impact of such judgment, including termination of alleged violation, provision for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment; and

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)–(2). Courts have consistently held that the court should not engage in *de novo* review of the relief that would best serve the public. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C.Cir.1995); *see also United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir.1988) (holding that "the court may not engage in an unrestricted evaluation of what relief would best serve the public"). Rather, the court is confined to the factors alleged in the government's complaint. *See Microsoft*, 56 F.3d at 1459.

In this case, the government alleges that the merger would have anticompetitive effects on both the world SGA and the national CGA markets. *See* Compl. ¶ 36. Specifically, the government has determined that both Alcoa and Reynolds own and operate refining capacity of both SGA and CGA in the same regions. For example, according to the government's Competitive Impact Statement, Alcoa and Reynolds each independently own and operate SGA refining plants in the Australian Outback and CGA refining and production plants in Texas. *See* CIS at 8–9. In a market as highly concentrated as the aluminum industry, allowing these two companies to combine production efforts could have serious consumer-price ramifications. *See* Compl. ¶¶ 18, 32. In addition, restrictions on supply raise manufacturing costs that would be passed almost entirely to consumers. The proposed final judgment addresses these concerns by requiring Alcoa to divest all of the SGA and CGA production facilities owned and operated by Reynolds in areas where Alcoa already possessed market influence, namely Texas and Australia. *See* Proposed Final Judgment at 6.

Requiring the divestment of these assets creates market competition for Alcoa, which, in turn, stabilizes the production levels of both SGA and CGA and helps keep the market price lower. *See* CIS at 9. Divesting these assets in a manner that ensures the creation of viable ongoing businesses engaged in the refining and sale of SGA and CGA will create competition for Alcoa by reducing the time delay and significant start-up costs of building new refining operations. *See id.* By requiring the sale of existing production plants, the government ensures that the pre-merger market competition levels remain stable and that no firm obtains the ability to affect prices unilaterally. *See*

United States Response to Public Comments at 6.

Indeed, the government states that until the required divesture, the aluminum industry was too costly for a new company to enter. *See* CIS at 7. Now, with much of the cost substantially reduced through previous investment by Reynolds, new opportunities exist for companies looking to compete effectively in this market. *See* United States Response to Public Comments at 6. Therefore, in accordance with Title 15 U.S.C. § 16(e), the court determines that the public interest has been served because the divesture of these assets will have an overall positive impact on competition in the aluminum industry.

In addition to the competitive impact of the judgment, the court must consider the enforcement mechanisms sought in the proposed judgment. *See* 15 U.S.C. § 16(e)(2). The consent decree requires Alcoa to find and negotiate with new SGA and CGA suppliers and allows only limited negotiations with the new owners of the divested assets. *See* Proposed Final Judgment at 9. The limitations are twofold: first, the judgment allows Alcoa, subject to restrictions, to contract with the new owners of the divested assets for supply of SGA. *See id.* at 9–10. However, the restrictions limit Alcoa's ability to exercise control over the flow of supply from the divested asset by limiting both the quantity and duration of the contracts until a new supply source can be found. *See* CIS at 10. Second, the final judgment requires Alcoa to contract with the purchaser of the divested Texas production facility for a two-year supply of bauxite.[3] This mechanism may create an additional incentive for new companies to purchase the divested asset, therefore ensuring the restoration of

competition sought by the government. *See* CIS at 11.

■ In reviewing the judgment proposed by the parties, the court must give "due respect to the Justice Department's perception of the market structure and its view of the nature of the case." *See United States v. Microsoft Corp.,* 56 F.3d 1448, 1461 (D.C.Cir.1995). In light of this deferential standard, the court determines that the judgment meets the requirements set forth by the statute and is in the public interest. Further, considering that nothing in the consent judgment prohibits or restricts private antitrust lawsuits against Alcoa, the court holds that the government has fulfilled its duty by submitting a proposal that is "in the public interest," as defined by 15 U.S.C. § 16(e). *See* CIS at 11–12.

## V. Conclusion

For the reasons set forth above, the court grants the government's motion for entry of final judgment. An Order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously executed and issued this 10th day of July 2001.

## *ORDER*

## Accepting the Consent Decree and Entering Final Judgment

Upon consideration of the motion by the United States for entry of final judgment with respect to the proposed consent decree, and for the reasons stated in the court's Memorandum Opinion, the court hereby determines that the proposed consent decree is in "the public interest" as contemplated by the Tunney Act, 15

---

**3.** When refined, Bauxite, a raw aluminum ore, yields both SGA and CGA. *See* Compl.

¶ 2.

U.S.C. § 16(e). Accordingly, it is this 10th day of July 2001,

**ORDERED** that the consent decree be accepted and government's motion for entry of final judgment be and hereby is **GRANTED**.

**SO ORDERED.**