**UNITED STATES of America, Plaintiff,**

v.

**ENOVA CORPORATION, Defendant.**

**No. Civ.A. 98–583.**

United States District Court, District of Columbia.

June 30, 2000.

Jade Alice Eaton, U.S. Dept. of Justice, Washington, DC, for U.S.

Linda M. McMahon, Steven C. Sunshine, Sherman & Sterling, Washington, DC, for Enova Corp.

James Barr Moorhead, Steptoe & Johnson, L.L.P., Washington, DC, for Southern California Edison Co.

## MEMORANDUM OPINION

ROBERTS, District Judge.

■ This complaint was brought by the Justice Department to enjoin the merger of a California electrical utility and California's dominant natural gas transportation and storage company. The parties filed a consent decree along with the complaint. The Justice Department has moved for entry of final judgment which would permit the merger to be consummated subject to the conditions set forth in the consent decree. Because I find that entry of final judgment is in the public interest, the Justice Department's motion will be granted and the proposed final judgment will be entered.

## BACKGROUND

On October 12, 1996, defendant Enova Corporation ("Enova"), entered into an Agreement and Plan of Merger and Reorganization with Pacific Enterprises ("Pacific"). On March 9, 1998, the Justice Department filed this complaint pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25 (1994), alleging that the Enova/Pacific merger would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

### I. The Merger and Its Potential Anticompetitive Effect

The gravamen of the government's complaint is that a merger between Enova and Pacific would give the merged entity ("PE/Enova") both the ability and incentive to raise electricity prices in California and injure competition in California's electricity generation market. Enova owns one of California's three major electric utilities California,[1] selling electricity through plants that run on coal, gas, nuclear power, and hydropower. (Compl. at ¶ 1.) Among Enova's assets are two low-cost gas-fired power plants—the Encina and South Bay electricity generation facilities—which run nearly year-round. (Competitive Impact Stmnt. at 9.) The complaint alleges that Pacific, through its wholly-owned subsidiary Southern California Gas Company ("SoCalGas"), operates an intrastate pipeline system that gives Pacific a monopoly over natural gas transportation and storage services in southern California. (Compl. at ¶ 2.) By virtue of its monopoly power over gas transportation and storage, Pacific can control the supply of gas and in turn the price of gas. (Id.) An increase in the price of gas increases the cost of operating gas-fired power plants. (Id.)

---

1. Enova owns San Diego Gas & Electric Co. ("SDG & E"), an electrical utility serving the San Diego area. (Competitive Impact Stmnt. at 3.) SDG & E and two other regulated, investor-owned utilities dominate California's electricity market. (Id. at 4.)

The complaint further alleges that, of the various types of power plants, gas-fired plants are generally the most costly to operate. (*Id.* at ¶ 3.) During periods of high-demand for electricity,[2] when the use of gas-fired plants is most prevalent, the cost of running gas-fired plants can dictate the cost of electricity in California. (*Id.*)[3] According to the complaint, if an electrical utility were able to keep the costs of operating gas-fired plants low, it would have an incentive to raise electricity prices because the resulting increase in revenue collected by the utility would outpace the higher cost of running the gas-fired plants. (*Id.*) This projected increase in profit margin is particularly likely given the high inelasticity of demand for electricity,[4] which means that the utility could increase the price of electricity without risking the loss of price-sensitive customers to competitors. (*Id.*)

Prior to the PE/Enova merger, Pacific's monopoly over natural gas transmission gave it the power to constrict the supply of natural gas to gas-fired plants,[5] thereby raising the price of natural gas and in turn the price of electricity. However, Pacific had little incentive to pursue this course because it was not selling electricity and thus would not benefit from higher electricity prices.[6] Conversely, Enova, as the owner of low-cost electricity generation facilities, had the incentive to raise electricity prices, but lacked the ability to do so because it could not alter natural gas prices. The merger between Pacific and Enova means that PE/Enova's ownership of low-cost gas-fired plants would enable it to profit handsomely from any increase in electricity prices, substantially offsetting any loss in gas transmission and distribution sales. (*Id.* at ¶ 24.) Therefore, the complaint alleges, if Pacific and Enova are

2. Peak electricity demand in California is usually during the summer due to the increased use of air-conditioning and other electric-powered appliances. (Competitive Impact Stmnt. at ¶ 5.)

3. Since 1998, over 80% of electricity generated in California is bought and sold through the California Power Exchange Pool ("the Pool"). (Compl. at ¶¶ 10, 12.) The Pool is a computerized central bidding system which automatically matches electricity supply and demand every half-hour over the course of the day. (*Id.* at ¶ 10.) Electricity sellers and buyers send in their bids to buy and sell electricity every half-hour. (*Id.* at ¶ 11.) The Pool then acts as a market-maker, matching buyers and sellers until all demand is met and establishing a market clearing price that is equal to the price of the most expensive unit sold during that half-hour. (*Id.*) During periods of high demand, gas-fired plants traditionally supply the most expensive units of electricity sold and therefore set the overall price of electricity. (*Id.* at ¶ 21.)

4. Elasticity of demand refers to the tendency of consumers to substitute away from a product when its price increases. Demand for electricity in California is highly inelastic because consumers do not switch to other energy sources when the price of electricity increases. (Competitive Impact Stmnt. at 6.) Moreover, there are only two major interstate electricity transmission lines running into

California. (*Id.*) When these lines reach their capacity during peak hours, generation from within the state must meet the excess demand. (*Id.*)

5. Ninety-six percent of gas-fired generators in southern California buy gas transportation and storage service from Pacific. (Competitive Impact Stmnt. at 5.)

6. Though the parties did not fully address this point in their pleadings to this Court, Pacific apparently lacked the pre-merger incentive to raise its prices because, despite its monopoly over gas transportation and distribution facilities in southern California, Pacific did have competitors to whom its customers could turn in the event of a price increase. In proceedings before the California Public Utilities Commission, Enova and Pacific maintained that SoCalGas faced competition from "alternative pipelines and storage facilities delivering interstate or surplus local California production of natural gas, alternate fuels, municipalization of SoCalGas's distribution facilities, and 'bypass by wire' (competition to local gas generation by out-of-state electricity generators)." *Re Pacific Enterprises*, 1998 WL 211974, 184 P.U.R.4th 417, 449 (1998). Thus, if Pacific increased its prices, it presumably risked not only raising the eyebrows of California's utility regulators, but also losing money that would not have been offset by increased revenues from another sector of its business.

permitted to merge, PE/Enova would have both the ability and the incentive to limit the supply of natural gas to competing gas-fired generators, thereby increasing the price of operating gas-fired plants, and in turn raising the price of electricity in California during periods of high demand. (*Id.* at ¶¶ 4, 24.) The complaint further alleges that PE/Enova's ability to manipulate the market clearing price of electricity would substantially curtail competition in California's electricity generation market. (*Id.*) It is also highly unlikely that natural market forces could counteract these effects because of the significant entry barriers to the markets for interstate natural gas transportation and electric power generation.[7]

## II. *The Proposed Entry of Final Judgment*

As is often the case in modern antitrust enforcement, the Justice Department filed together with its complaint a stipulation and order pursuant to which the parties consented to entry of a proposed final judgment aimed at remedying the alleged anticompetitive effects of the merger. The parties' proposed final judgment embodies a dual-pronged solution to the dilemma posed by the PE/Enova merger which focuses on eliminating PE/Enova's incentive to raise electricity prices. First, the consent decree requires Enova to divest its two low-cost gas-fired power plants, the Encina and South Bay electricity generation facilities,[8] to a purchaser or purchasers acceptable to the United States in its sole discretion. (Proposed Final J. at §§ II(F), IV(A).)[9] Second, the proposed final judgment limits PE/Enova's ability to acquire other low-cost gas-fired plants to replace the divested assets by requiring PE/Enova to seek prior approval from the United States before acquiring any such assets,[10] and by monitoring PE/Enova's ability to enter into other power management contracts.[11] (Proposed Final J. at

---

7. According to the Justice Department, California's regulatory scheme, particularly its rigorous pipeline certification process and restrictions on access to intrastate gas transportation markets, creates a virtually insurmountable barrier to would-be newcomers in California's natural gas transportation market. (Compl. at ¶ 26.) Likewise, entry into California's electrical generation market is governed by a thicket of environmental, safety, zoning, and other regulations. (*Id.* at 27.)

8. At the time the competitive impact statement was filed, Enova controlled over 2,600 megawatts of electricity. (Competitive Impact Stmnt. at 7.) The proposed final judgment requires divestiture of these two plants which have an aggregate capacity of 1,644 megawatts. (*Id.* at 9.) These two generators run nearly year-round at low-cost and could thus earn significant profits if the electricity prices rise as a result of a constricted supply of natural gas. (*Id.*)

9. The approvals required under the proposed decree do not obviate the need for any prospective buyer of those assets to obtain the necessary regulatory approvals from the California Public Utilities Commission, or any other relevant governmental authorities. (Proposed Final J. at § IV(B).)

10. The proposed decree subjects the following transactions to prior approval by the United States: (1) outright acquisition of existing "California Generation Facilities" (which are defined as electricity generation facilities in existence on January 1, 1998) with over a 500 megawatt aggregate capacity (Proposed Final J. at §§ II, V(A)(1), V(B)); (2) any contract that allows PE/Enova to control such assets over the 500 megawatt cap (*id.* at §§ V(A)(2), V(B)); (3) any contract for the operation and sale of output from California Generating Facilities over the 500 megawatt cap owned by the Los Angeles Department of Water and Power ("LADPW"), which is California's second largest electricity generator (*id.* at §§ II(B), V(A)–(B)); and (4) future "tolling agreements" which would permit PE/Enova to "control" electric generating plants (*i.e.* set the facility's level of electrical output) by renting them as opposed to purchasing them outright. (*Id.* at §§ II(A), II(E), V(C)(3)).

11. Such contracts, if permitted, would allow Enova to operate other companies' plants in return for a potentially large percentage of the profits generated by those plants. (Competitive Impact Stmnt. at 15.) Thus, if PE/Enova were permitted to enter into power management contracts, its incentive to increase electricity prices would essentially be no different than if PE/Enova owned the plant itself (*Id.*)

§ V(C)(4)–(5).) Accordingly, the Justice Department contends that the double-fisted remedy of divestiture and prior approval/contract monitoring sufficiently protects southern California's electricity market from any potentially anticompetitive tactics PE/Enova might employ.

### III. *Public Comments*

Pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h), known as the Tunney Act, the Justice Department published the proposed final judgment along with a competitive impact statement in the Federal Register on June 18, 1998. The public was then given 60 days in which to comment on the proposed final judgment. Only two parties, Southwest California Edison Company ("SCE") and the City of Vernon ("Vernon"), filed comments.

### A. *SCE's Comments*

SCE is a direct competitor of Enova's for electricity sales in southern California. (SCE Comments at 5 n. 3.) SCE argued that the proposed final judgment only forecloses one avenue by which PE/Enova could increase the price of electricity while leaving others wide open. SCE maintained that, notwithstanding the remedies contained in the proposed final judgment, PE/Enova would still be able to enter into one or more transactions which would give it the incentive to exert its market power over natural gas transmission to affect the electricity market. (*Id.* at 3–4.) According to SCE, PE/Enova would still be permitted by the proposed final judgment to acquire new or repowered/rebuilt generating facilities, to enter into tolling agreements, to purchase electrical output from the divested plants, and to enter into financial contracts (*i.e.* derivatives) tied to the prices in the California electric market. (*Id.* at 4.) In SCE's view, the proposed final judgment should have eliminated PE/Enova's market power by requiring Pacific to divest its natural gas assets, as opposed to eliminating its incentives to

exercise that power by mandating divestiture of Enova's low-cost gas-fired plants. (*Id.* at 5, 14–15.) SCE therefore proposed the following alternative remedies: (1) that the merger be rescinded; (2) that Pacific's natural gas pipeline be divested; (3) that the pipeline be controlled by an independent system operator; (4) that PE/Enova be barred from trading financial instruments for Southern California electricity markets. (*Id.* at 6.)

SCE also moved for leave to file an amicus brief with this Court and for leave to orally participate in a Tunney Act hearing. However, SCE subsequently withdrew its motion, indicating that it had "reconsidered its position in this matter" and therefore no longer opposed entry of final judgment. (Stmnt. of Proposed Amicus [SCE] Concerning Entry of Final J.)

### B. *Vernon's Comments*

Vernon operates its own municipal electrical utility, which includes a gas-fired plant and a municipal gas utility. (Vernon comments at 1.) It objected to the proposed consent decree on the ground that the PE/Enova merger would "alter and damage the potential for competition in the California natural gas market" by "combin[ing] the two largest natural gas transmission and distribution companies in southern California." (*Id.*) Vernon pointed out that there had been rumors that another natural gas pipeline would be built through southern California to compete with SoCalGas, Pacific's wholly-owned subsidiary. (*Id.* at 2.) According to Vernon, Enova's electrical utility was considered the largest potential "anchor" customer of this new pipeline. (*Id.*) The PE/Enova merger, however, would purportedly "cement a permanent alliance" between SoCalGas and Enova, thereby depriving the new pipeline of its potential anchor. (*Id.*)

### IV. *Justice Department's Responses to the Public Comments*

On January 11, 1999, the Justice Department responded to SCE and Vernon's

comments.[12] The government argued that SCE's comments "misse[d] the mark, because each of the potential transactions it lists is a transaction that *Pacific could engage in whether or not it merges with Enova.*" (Pl.'s Resp. to Public Comments at 6) (emphasis in original). In other words, once electricity deregulation was accomplished, Pacific already had the ability and incentive to exploit SoCalGas's pipeline monopoly by engaging in the types of transactions enumerated by SCE. The proposed final judgment, by contrast, was designed to correct for the potential anticompetitive effects specifically caused by the PE/Enova merger itself as opposed to deregulation's general impact on southern California's electricity market. (*Id.* at 7.) The consent decree purportedly accomplishes this result by requiring Enova to divest its low-cost generating assets which otherwise would have given PE/Enova the incentive to use its natural gas pipeline monopoly to distort the market for electricity during periods of high demand, and by installing checks to prevent PE/Enova from acquiring or controlling other assets which might give rise to the same anticompetitive incentives. (*Id.* at 7–8.)

As for Vernon's concern about the potentially deleterious effect of the PE/Enova merger on southern Califonia's natural gas transmission market, the government countered that its complaint "does not allege violations of the natural gas transmission market," but rather seeks to remedy potential harm in the electricity market. (*Id.* at 10.) Accordingly, the government summarily rejected Vernon's objections as "not relevant to this proceeding." (*Id.*)

## DISCUSSION

### I. *Standard of Review*

Under the Tunney Act, the court must "determine that the entry of judgment is in the public interest." 15 U.S.C. § 16(e). In making this public interest determination, the court may consider:

(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and other considerations bearing upon the adequacy of such judgment;

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial

*Id.*

As the D.C. Circuit has held, the Tunney Act allows courts to weigh, among other things, the relationship between the allegations set forth in the government's complaint and the remedy imposed by the proposed final judgment, whether the proposed final judgment is overly ambiguous, whether the enforcement mechanisms it employs are adequate, and whether the proposed final judgment may affirmatively prejudice third parties. *See United States v. Microsoft Corp.,* 56 F.3d 1448, 1461–62 (D.C.Cir.1995) (*per curiam*). The court may not, however, "make a *de novo* determination of facts and issues" in conducting its public interest inquiry. *United States v. Western Elec. Co.,* 993 F.2d 1572, 1577 (D.C.Cir.), *cert. denied,* 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993) (internal quotation and citation omitted). Rather, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *Id.* (internal quotation and citation omitted). The court should therefore reject the proposed final judgment only if "it has exceptional confidence that adverse antitrust consequences will result—perhaps akin to the confidence that would

---

12. SCE did not withdraw its objections to the entry of final judgment until March 26, 1999.

justify a court in overturning the predictive judgments of an administrative agency." *Microsoft*, 56 F.3d at 1460 (internal quotations and citation omitted).

In conducting its inquiry, the court is not required to hold a hearing or conduct a trial. *See* 119 Cong.Rec. 24,598 (1973); *United States v. Airline Tariff Pub. Co.*, 836 F.Supp. 9, 11 n. 2 (D.D.C. 1993). The Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone. A court may, in its discretion, invoke additional procedures when it determines such proceedings may assist in the resolution of issues raised by the comments. *See* H.R.Rep. No. 93–1463, at 8–9 (1974), *reprinted in* U.S.S.C.A.N. 6535, 6539. However, because there were only two commenters and one of the two has since withdrawn its objections to the merger, there is no compelling reason to hold a hearing in this matter.

## II. *Analysis*

The proposed final judgment seeks to avert the potential anti-competitive effects of the PE/Enova merger on California's electricity market. The PE/Enova merger is a "vertical" merger because it involves the combination of the "upstream" segment of a business with a "downstream" segment. The mere fact that the merged company possesses market power in either the upstream or downstream market does not necessarily mean that competitive harm will result from the merger. *See* IIIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 756 (1996). While a so-called "horizontal" merger between two competitors in the same industry automatically increases market concentration by eliminating a competitor, vertical mergers do not in and of themselves decrease the number of competitors in any one market. *See id.* at ¶ 763c. Indeed, vertical mergers often promote efficiencies by consolidating input and output operations under one umbrella. *See generally id.* at

¶¶ 755–59 (1996). Vertical mergers do, however, raise antitrust concerns when the merged entity is willing and able to leverage its power in one market to raise prices and/or eliminate competition in another. *See id.* at ¶ 756. Here, the danger is that PE/Enova will use its monopoly position in the upstream segment of its business (natural gas delivery) to raise prices and harm competition in the downstream segment of its business (electrical power generation).

The proposed final judgment focuses on limiting PE/Enova's incentive to engage in this type of leveraging rather than on its ability to do so. All sides agree that the proposed final judgment will not decrease Pacific's preexisting market power in southern California's natural gas transmission market. Rather, the proposed final judgment seeks to eliminate PE/Enova's new incentive to use its monopoly over natural gas transmission in southern California to limit competition and raise prices in California's electricity generation market. The fundamental question presented by the proposed final judgment is whether Enova's divestiture of its low cost gas-fired generators coupled with the implementation of a system of prior approvals and contract monitoring sufficiently eliminates PE/Enova's incentive to raise prices and limit competition in the electricity generation market. I find that it does.

Whether the ends of antitrust law might better be served, as SCE and Vernon have suggested, by attacking PE/Enova's natural gas transmission monopoly is not for this Court to decide. The D.C. Circuit has held that a court may not reject a remedy simply because it may not be, in the court's view, the "best" remedy available. *Microsoft*, 56 F.3d at 1460 (D.C.Cir.1995). Rather, "a proposed consent decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of the public interest.'" *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 151 (D.D.C.1982) (citations

omitted) (quoting *United States v. Gillette Co.*, 406 F.Supp. 713, 716 (D.Mass.1975)), *aff'd sub. nom.* *Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

█ The proposed final judgment "falls within the range of acceptability" because it sufficiently curtails PE/Enova's incentive to abuse its market power over southern California's natural gas transmission market in order to raise electricity prices and/or diminish competition in southern California's electricity generation market. This result is accomplished by requiring Enova to divest those assets which would provide the largest profit margins if the price of electricity rose and by imposing a rigorous system of prior approvals and contract monitoring to assure that PE/Enova does not take steps to undo the effects of the divestiture. It is plainly not for the Court to second-guess the government's predictions concerning the impact of the merger or the proposed remedies. *See Microsoft*, 56 F.3d at 1460–61. Furthermore, any potentially deleterious effect that the merger may have on California's natural gas market is, as the government points out, beyond the allegations made and issues raised in the complaint[13] and is therefore beyond the scope of this Court's review. *See id.* at 1459–60.

It is equally important to note that PE/Enova will remain subject to ongoing regulatory review. Indeed, the PE/Enova merger has already run the gauntlet of regulatory approvals, having obtained the blessing of no less than four regulatory bodies subject to various conditions intended to mitigate potential anticompetitive effects. *See Sempra Energy, Mem.Op. and Order Authorizing Acquisition of Public Utility Companies and Granting Exemption from Registration*, No. 35–26890, 67 S.E.C. Docket 994 (June 26, 1998); *Southern Cal. Edison Co. v. San Diego Gas & Elec. Co.*, 83 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,199 (May 27, 1998); *Re Pacific Enterprises*, 1998 WL 211974, 184 P.U.R.4th 417 (1998); 81 Cal.Ops.Cal. Att'y Gen. 1 (1998).[14] There is also nothing in the proposed final judgment limiting the ability of the Justice Department or any other federal agency to investigate and challenge PE/Enova's future actions should the circumstances warrant. For instance, should PE/Enova attempt to manipulate the commodities markets by purchasing derivatives tied to the price of electricity as SCE once predicted, the Commodity Futures Trading Commission would have jurisdiction under the Commodity Exchange Act, 7 U.S.C. §§ 1–25, to address such an abuse.

## CONCLUSION

I am not firmly convinced that entry of the proposed final judgment would result in adverse antitrust consequences. PE/Enova's divestiture of its low-cost gas-fired generators coupled with the system of prior approvals and contract monitoring should reduce PE/Enova's incentive to engage in the anticompetitive practices alleged in the complaint. Entry of the proposed final judgment is therefore in the public interest. Plaintiff's motion for entry of final judgment will be granted and the proposed final judgment will be entered.

13. The complaint defines the relevant market as "[t]he provision of electricity in California during high demand periods" and not the market for natural gas transportation and storage. (Compl. at ¶ 19.)

14. The Federal Energy Regulatory Commission found that the proposed merger created the dangers cited by the government in this case, and also concluded that Enova's divestment of its gas-fired plants would alleviate the vertical market power problems raised. *See*

*Southern Cal. Edison Co. v. San Diego Gas & Elec. Co.*, 79 Federal Energy Reg. Comm'n Rep. (CCH) ¶ 61,372, at 62,565 n. 58 (June 25, 1997). The California Public Utilities Commission, which is required to authorize any such divestiture, subsequently imposed remedies consistent with the consent decree requiring, among other things, that Enova sell its gas-fired plants by a date certain. *See Re Pacific Enterprises*, 1998 WL 211974, 184 P.U.R.4th at 498.

## FINAL JUDGMENT

WHEREAS Plaintiff United States of America (hereinafter "United States"), having filed its Complaint herein on March 9, 1998, and Plaintiff and Defendant, by their respective attorneys, having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting any evidence against or an admission by any party with respect to any issue of law or fact herein;

AND WHEREAS Defendant has agreed to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS the essence of this Final Judgment is divestiture of assets to ensure that competition, as alleged in the Complaint, is not substantially lessened;

AND WHEREAS Plaintiff requires Defendant to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS Defendant has represented to Plaintiff that as to the divestiture ordered herein Defendant will later raise no claims of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW, THEREFORE, before the taking of any testimony, and without trial or adjudication or admission of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

### I. JURISDICTION

This Court has jurisdiction over each of the parties hereto and the subject matter of this action. The Complaint states a claim upon which relief may be granted against Defendant under Section 7 of the Clayton Act, as amended. 15 U.S.C.A. § 18 (West 1997).

### II. DEFINITIONS

As used in this Final Judgment:

A. "Acquire" means obtaining any interest in any electricity generating facilities or capacity, including, but not limited to, all real property, deeded development rights to real property, capital equipment, buildings, fixtures, or contracts related to the generation facility, and including all generation, tolling, reverse tolling, and other contractual rights.

B. "California Generation Facilities" means (1) electricity generation facilities in California in existence on January 1, 1998, excluding such facilities that are rebuilt, repowered, or activated out of dormancy after January 1, 1998, as long as such rebuild, repower, or activation out of dormancy project, if done by Defendant, begins within one year of purchase; and (2) any contract for operation and sale of output from generating assets of the Los Angeles Department of Water and Power ("LADWP").

C. "California Public Power Generation Management Services Contract" means a bona fide contract for managing the operation and sale of output from California Generation Facilities owned by a municipality, an irrigation district, other California state authority, or their agents on January 1, 1998; provided, however, that a contract for managing the operation and sale of output from generation assets of LADWP shall not be deemed a California Public Power Generation Management Services Contract.

D. "Common Facilities" means those facilities associated with the generation assets to be divested that are located on or near such assets, and that are necessary to the operation of non-generating aspects of Enova's electric business, including, but not limited to, the operation of Enova's distribution, transmission, and communications systems.

E. "Control" means to have the ability to set the level of output of an electricity generation facility.

F. "Divestiture Assets" means the Encina and South Bay electricity generation facilities owned by Enova at Carlsbad and Chula Vista, California, including, but not limited to, all real property rights necessary to the operation of the facilities; buildings, generation equipment, inventory, fixed assets and fixtures, materials, supplies, on-site warehouses or storage facilities, and other tangible property or improvements used in the operation of the facilities; licenses, permits (including but not limited to environmental permits and all permits from federal or state agencies), and authorizations issued by any governmental organization relating to the facilities, and all work in progress on permits or studies undertaken in order to obtain permits; plans for design or redesign of these electricity generating assets; contracts (including but not limited to customer contracts), agreements, leases, commitments, and understandings pertaining to the facilities and their operations; customer lists, and marketing or consumer surveys relating to these electricity generating assets; contracts for firm capacity and energy of longer than three months relating to these assets; records maintained by Enova necessary to operation of these assets; and all other interests, assets or improvements customarily used in the generation of electricity at these facilities.

G. The terms "Enova" and "Defendant" mean Enova Corporation, a California corporation headquartered in San Diego, California, and includes its successors and assigns, and its parents, subsidiaries, directors, officers, managers, agents, and employees acting for or on behalf of any of them.

H. The terms "Independent System Operator" or "ISO" mean an entity that operates the intrastate gas transmission pipelines and related facilities of Pacific Enterprises. "Operates" includes full operational and pricing control over all such facilities and total authority to determine whether and how much capacity is available in the intrastate pipeline, whether curtailment of transmission service is required on any part of that system, whose service is curtailed, and the prices to be charged.

I. "Pacific" means Pacific Enterprises, a California corporation headquartered in Los Angeles, California, and includes its successors and assigns, and its parents, subsidiaries, directors, officers, managers, agents, and employees acting for or on behalf of any of them.

J. "Portland General Electric Contract" means the contracts, dated November 15, 1985, for 75 MW of firm capacity and associated transmission.

K. The terms "Auction Procedures" and "California Auction Procedures" mean the auction procedures set forth in a decision addressing Enova's application under section 851 of the California Public Utilities Code to divest the Divestiture Assets.

L. The term "Southern California" means the counties in California currently served by Pacific's gas pipelines.

### III. *APPLICABILITY*

A. The provisions of this Final Judgment apply to Defendant, its successors and assigns, parents, subsidiaries, directors, officers, managers, agents, and employees, and all other persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise.

B. Enova shall require, as a condition of the sale or other disposition of all or substantially all of its assets, or of a lesser business unit that includes Enova's business of intrastate transmission and retail distribution and sale of natural gas, that the transferee agree to be bound by the provisions of this Final Judgment.

### IV. *DIVESTITURE*

A. Defendant is hereby ordered and directed, in accordance with the terms of this Final Judgment, and specifically in

accordance with the schedule in this section, to divest the Divestiture Assets to a purchaser or purchasers acceptable to the United States, in its sole discretion. Purchasers whose bids are accepted by the United States under Section IV(D)(3) will be deemed acceptable.

B. Except as provided in Section VI, these divestitures shall occur through the Auction Procedures and shall be subject to necessary approvals by the California Public Utilities Commission ("CPUC") and other governmental authorities.

C. Defendant shall use its best efforts to accomplish the divestiture as expeditiously as possible, but in any event within the schedule set forth in Section IV(E) below. These efforts shall include, but are not limited to, making the necessary regulatory filings and applications in a timely fashion and using its reasonable best efforts to obtain such approvals as expeditiously and timely as possible.

D. Certain Conditions on the Auction Procedures.

1. Enova may reject any bid submitted by any party for all or part of the Divestiture Assets if the bid offers consideration in an amount less than the book value of such assets as reflected on the most recent regularly prepared balance sheet of Enova at the time the bid is submitted; provided, however, that nothing in this section shall prevent the CPUC from setting a minimum bid price or rejecting any bid on the basis of price or otherwise.

2. Enova may structure its requests for bids to require reasonable easements, licenses, and other arrangements for the continued operation of Common Facilities by Enova.

3. Before Enova can accept a bid by a potential purchaser received under the Auction Procedures with respect to any of the Divestiture Assets to be divested, the bid must be screened by the United States as specified in this section. Enova shall provide to the United States copies of all bids and any other documents submitted by any potential purchaser pursuant to the Auction Procedures. The United States shall have thirty days from the date it receives a copy of a bid to notify Enova that the potential bid is unacceptable with respect to any of the Divestiture Assets specified in the bid; provided, however, the United States may extend the thirty-day review period for any such bid for one additional thirty-day period by providing written notice to Enova; provided further, in all cases the period for review of potential bids by the United States shall expire no later than the earlier of five days prior to the date set by the CPUC for submission of the proposed winning bid by Enova or the thirty-day period (with one possible thirty-day extension) described above. If the United States does not notify Enova that a proposed bid is unacceptable within the applicable time period specified above, the purchaser making such bid shall be deemed acceptable by the United States with respect to all of the Divestiture Assets specified in that bid. The United States shall base its review of all potential bids screened pursuant to this paragraph solely on the criteria identified in Section IV(I) of this Final Judgment. The United States shall take all appropriate and necessary steps to keep the information received pursuant to this section confidential.

E. Timing.

1. Enova shall submit applications for authorization and approval of the auctions specified in Paragraph IV(B) above for the Divestiture Assets no later than ninety days after notice of entry of this Final Judgment.

2. Enova shall complete the sale of the Divestiture Assets as soon as practical after the receipt of all necessary governmental approvals; provided, however, if the sale of any of the Divestiture Assets is not completed within eighteen months after the date of the entry of this Final Judgment, a trustee shall be appointed pursuant to Section VI of this Final Judgment to effect the divestiture of any unsold assets;

provided further, the United States may extend the eighteen-month period by six months by serving written notice on Enova prior to the expiration of the eighteen-month period; provided further, Enova and the United States may by mutual agreement extend further the time in which any of the Divestiture Assets shall be sold.

F. In accomplishing the divestiture ordered by this Final Judgment, Defendant promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. The California Auction Procedures shall be deemed to satisfy this requirement. Defendant shall inform any person making an inquiry regarding a possible purchase that the sale is being made pursuant to this Final Judgment and provide such person with a copy of this Final Judgment. Defendant shall make known to any person making an inquiry regarding a possible purchase of the Divestiture Assets that the assets defined in Section II(F) are being offered for sale. Defendant shall also offer to furnish to all bona fide prospective purchasers, subject to customary confidentiality assurances, all information regarding the Divestiture Assets customarily provided in a due diligence process except such information subject to attorney-client privilege or attorney work-product privilege. Defendant shall make available such information to Plaintiff at the same time that such information is made available to any other person.

G. Defendant shall not interfere with any negotiations by any purchaser to employ any employee of the Defendant necessary to the operation of Divestiture Assets.

H. Defendant, shall, at minimum, permit prospective purchasers of the Divestiture Assets to have reasonable access to personnel and to make such inspection of the Divestiture Assets, and any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

I. Unless the United States otherwise consents in writing, the divestiture or divestitures pursuant to this section, or by the trustee appointed pursuant to Section VI of this Final Judgment, shall include the Divestiture Assets as specified in this Final Judgment (though not necessarily all to the same purchaser) and be accomplished by selling or otherwise conveying the Divestiture Assets to a purchaser or purchasers in such a way as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between any purchaser and Defendant give Defendant the ability unreasonably to raise the purchaser's costs, to lower the purchaser's efficiency, or otherwise to interfere in the ability of the purchaser to compete effectively in the provision of electricity in California; provided, however, the purchaser need not continue operation of these assets.

## V. ACQUISITION

A. General Prohibitions.

1. Defendant is enjoined from acquiring California Generation Facilities without prior notice to and approval of the United States. Such prior approval shall be within the sole discretion of the United States.

2. Defendant is enjoined from entering into any contracts that allow Defendant to control any California Generation Facilities without prior notice to and approval of the United States. Such prior approval shall be within the sole discretion of the United States.

B. Limitations on Prohibitions.

1. Acquisition cap—Defendant may acquire or control California Generation Facilities without prior approval of the United States if Defendant does not own or control, in the aggregate, more than 500 MW of capacity of California Generation Facilities. The capacity of Defendant's existing nuclear generation assets are excluded from the calculation of whether the

500 MW cap has been reached so long as the prices Enova receives for electricity generated by the existing nuclear generation assets are fixed by law or regulation. The Portland General Electric Contract capacity (75 MW) shall be included in the calculation of whether the 500 MW cap has been reached (reducing the total available to 425 MW), unless and until the Portland General Electric Contract terminates or is divested. The capacity of the Divestiture Assets shall be included in the calculation of whether the 500 MW cap has been reached, as long as Defendant owns such assets.

2. Acquisitions above the cap—In any event, the Defendant may acquire or control, California Generation Facilities in excess of 500 MW, subject to the prior approval of the United States as provided in Paragraphs V(A)(1) and V(A)(2).

C. Exceptions.

1. Outside California—Defendant may own, operate, control, or acquire any electricity generation facilities other than California Generation Facilities.

2. Cogeneration facilities—Defendant may own, operate, or control any cogeneration or renewable generation facilities in California.

3. Tolling agreements—Defendant may enter into tolling and reverse tolling agreements with any electricity generation facilities in California, provided Defendant does not control such facilities; provided further, that all such tolling and reverse tolling agreements include the following provision: "In accordance with the Final Judgment in *United States v. Enova Corporation*, entered on [date], Enova's successors and their affiliates shall not have any ability to set the level of output of this electricity generation facility."

4. California Public Power Generation Management Services Contracts—Defendant's entry into California Public Power Generation Management Services Contracts is not prohibited under Section V(A)(2) above, regardless of whether the contract allows for Defendant to exercise control of such facilities, and such contracts shall not be included in the calculation of whether the Acquisition Cap in Section V(B)(1) has been reached; provided however, Defendant may not enter into California Public Power Generation Management Services Contracts that allow the Defendant to exercise control of such facilities, without notice to the United States.

5. Notification of California Public Power Generation Management Services Contracts—Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C.A. § 18a (West 1997) ("HSR Act"), for each California Public Power Generation Management Services Contract it enters for which notice is required, Defendant shall provide notice thereof to the United States as follows:

a. Notification shall be provided within five days of acceptance of the contract, and shall include copies of all contracts, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the California Public Power Generation Management Services Contract that was the subject of the transaction.

b. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

D. Methods of Obtaining Prior Approvals and of Providing Notice—Defendant shall obtain prior approval and provide notice by sending the required materials to Chief, Transportation, Energy, and Agriculture Section, Antitrust Division, United States Department of Justice, 325 Seventh Street, N.W., Suite 500, Washington, DC 20004.

E. Other Legal Requirements—Nothing in this section limits the Defendant's responsibility to comply with the requirements of the HSR Act, with respect to any acquisition.

## VI. *APPOINTMENT OF TRUSTEE*

A. In the event that Defendant has not divested all of the Divestiture Assets within the time specified in Section IV of this Final Judgment, the Court shall appoint, on application of the United States, a trustee selected by the United States to effect the divestiture of the assets.

B. At or anytime after the appointment of the trustee, if either party believes a conflict may exist between this Final Judgment and an order of the CPUC relating to the Divestiture Assets, that party may move the Court for a resolution of the conflict in light of the status of any relevant CPUC proceeding and the purpose of this Final Judgment.

C. After the appointment of the trustee becomes effective, the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power and authority to accomplish the divestiture at the best price then obtainable upon a reasonable effort by the trustee, subject to the provisions of Sections VI and VII of this Final Judgment, and shall have such other powers as the Court shall deem appropriate. Subject to Section VI(D) of this Final Judgment, the trustee shall have the power and authority to hire at the cost and expense of Defendant any investment bankers, attorneys, or other agents reasonably necessary in the judgment of the trustee to assist in the divestiture, and such professionals and agents shall be accountable solely to the trustee. The trustee shall have the power and authority to accomplish the divestiture at the earliest possible time to a purchaser acceptable to the United States, in its sole judgment. Defendant shall not object to a sale by the trustee on any grounds other than the trustee's malfeasance. Any such objections by Defendant must be conveyed in writing to Plaintiff and the trustee no later than ten calendar days after the trustee has provided the notice required under Section VII of this Final Judgment.

D. The trustee shall serve at the cost and expense of Defendant, on such terms and conditions as the Court may prescribe, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Enova and the trust shall then be terminated. The compensation of such trustee and of any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished.

E. After the appointment of the trustee becomes effective, Defendant shall take no action to interfere with or impede the trustee's accomplishment of the required divestiture, and shall use its best efforts to assist the trustee in accomplishing the required divestiture, including best efforts to effect all necessary regulatory approvals. Subject to a customary confidentiality agreement, the trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities related to the Divestiture Assets, and Defendant shall develop such financial or other information relevant to the Divestiture Assets to be divested customarily provided in a due diligence process as the trustee may reasonably request. Defendant shall permit prospective purchasers of the Divestiture Assets to have access to personnel and to make such inspection of physical facilities and any and all financial, operational or other documents and information as may

be relevant to the divestiture required by this Final Judgment.

F. After the appointment of the trustee becomes effective, the trustee shall file monthly reports with Defendant, the United States, and the Court, setting forth the trustee's efforts to accomplish divestiture of the Divestiture Assets as contemplated under this Final Judgment; provided, however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Defendant may request that information in such reports that has been provided as confidential by the Defendant be deemed confidential by the trustee. If the trustee does not deem the information to be confidential, the information shall not be made public before Defendant has an opportunity to seek a protective order from the Court. The trustee shall maintain full records of all efforts made to divest these operations.

G. If the trustee has not accomplished the divestiture required by Section IV of this Final Judgment within six months after the appointment of the trustee becomes effective, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations; provided, however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such reports to Defendant and the United States, who shall each have the right to be heard and to make additional recommendations. The Court shall thereafter enter such orders as it shall deem appropriate to accomplish the purposes of this Final Judgment, which shall, if necessary, include extending the term of the trustee's appointment by a period requested by the United States.

## VII. *NOTIFICATION*

Within two business days following execution of a definitive agreement, contingent upon compliance with the terms of this Final Judgment, to effect, in whole or in part, any proposed divestiture pursuant to Sections IV or VI of this Final Judgment, Defendant or the trustee, whichever is then responsible for effecting the divestiture, shall notify Plaintiff of the proposed divestiture. If the trustee is responsible, it shall similarly notify Defendant. The notice shall set forth the details of the proposed transaction and list the name, address, and telephone number of each person not previously identified who offered to, or expressed an interest in or a desire to, acquire any ownership interest in the assets that are the subject of the binding contract, together with full details of same. Within fifteen calendar days of receipt by Plaintiff of such notice, Plaintiff may request from Defendant, the proposed purchaser, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture and the proposed purchaser. Defendant and the trustee shall furnish any additional information requested within fifteen calendar days of the receipt of the request, unless the parties shall otherwise agree. Within thirty calendar days after receipt of the notice or within twenty calendar days after Plaintiff has been provided the additional information requested from Defendant, the proposed purchaser, any third party, and the trustee, if there is one, whichever is later, the United States shall provide written notice to Defendant and the trustee, if there is one, stating whether

or not it objects to the proposed divestiture. If the United States provides written notice to Defendant and the trustee that it does not object, then the divestiture may be consummated, subject only to Defendant's limited right to object to the sale under Section VI(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed purchaser or upon objection by the United States, a divestiture proposed under Section IV or Section VI shall not be consummated. Upon objection by Defendant under the proviso in Section VI(C), a divestiture proposed under Section VI shall not be consummated. Provided, however, a proposed divestiture pursuant to the Auction Procedures approved by the United States under Section IV(D)(3) of this Final Judgment shall be deemed acceptable to the United States under this section.

## VIII. *AFFIDAVITS*

A. Within thirty calendar days of the filing of this Final Judgment and every forty-five calendar days thereafter until the divestiture has been completed whether pursuant to Section IV or Section VI of this Final Judgment, Enova shall, with respect to Divestiture Assets, deliver to Plaintiff an affidavit as to the fact and manner of Defendant's compliance with Sections IV or VI of this Final Judgment. Each such affidavit shall include, inter alia, the name, address, and telephone number of each person who, at any time after the period covered by the last such report, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts that Defendant has taken to solicit a buyer for the Divestiture Assets and to provide required information to prospective purchasers, including the limitations, if any, on such information.

B. For Divestiture Assets being sold using the California Auction Procedures, during such Auction Procedures, submission of bids to the United States in compliance with Section IV shall satisfy compliance with the required contents of the affidavits in Section VIII(A).

C. Within twenty calendar days of the filing of this Final Judgment, Defendant shall deliver to Plaintiff an affidavit which describes in detail all actions Defendant has taken and all steps Defendant has implemented on an on-going basis to preserve the Divestiture Assets pursuant to Section X of this Final Judgment and describes the functions, duties and actions taken by or undertaken at the supervision of the individuals described at Section X(J) of this Final Judgment with respect to Defendant's efforts to preserve the Divestiture Assets. Defendant shall deliver to Plaintiff an affidavit describing any changes to the efforts and actions outlined in Defendant's earlier affidavits filed pursuant to this section within thirty calendar days after the change is implemented. The United States shall take all necessary steps to keep the information received pursuant to this section confidential.

D. Defendant shall preserve all records of all efforts made to preserve and divest the Divestiture Assets.

## IX. *FINANCING*

Defendant shall not finance all or any part of any divestiture made pursuant to Sections IV or VI of this Final Judgment.

## X. *PRESERVATION OF ASSETS*

Until the divestiture required by the Final Judgment has been accomplished:

A. Defendant shall take all steps necessary to ensure that the Divestiture Assets will be maintained and operated as an ongoing, economically viable and active competitor in the provision of electricity; and that, except as necessary to comply with Sections X(B) to X(K) of this Final

Judgment, the management of any electricity generating facilities shall be kept separate and apart from the management of Defendant's other businesses and will not be influenced by Defendant, and the books, records, and competitively sensitive sales, marketing and pricing information associated with electricity generating facilities will be kept separate and apart from that of Defendant's other businesses.

B. Defendant shall use all reasonable efforts to maintain and increase sales of electricity by the Divestiture Assets, and Defendant shall use reasonable efforts to maintain and increase promotional, advertising, sales, marketing, and merchandising support for wholesale electricity sold in California.

C. Defendant shall take all steps necessary to ensure that the Divestiture Assets are fully maintained in operable condition and shall maintain and adhere to normal maintenance schedules for the Divestiture Assets.

D. Defendant shall provide and maintain sufficient lines of sources of credit to maintain the Divestiture Assets as viable, ongoing businesses.

E. Defendant shall provide and maintain sufficient working capital to maintain the Divestiture Assets as viable ongoing businesses.

F. Defendant shall not, except as part of a divestiture approved by the United States, remove, sell, or transfer any of the Divestiture Assets, other than sales in the ordinary course of business.

G. Unless it has obtained the prior approval of the United States, Defendant shall not terminate or reduce the current employment, salary, or benefit arrangements for any personnel employed by Defendant who work at, or have managerial responsibility for, electricity generating facilities, except in the ordinary course of business.

H. Defendant shall continue all efforts in progress to obtain or maintain all permits necessary for operating their electricity generating capacity.

I. Defendant shall take no action that would jeopardize its ability to divest the Divestiture Assets as viable, ongoing businesses.

J. Defendant shall appoint a person or persons to oversee the Divestiture Assets, and who will be responsible for Defendant's compliance with Section X of this Final Judgment.

K. Prior to the sale of Divestiture Assets, Enova shall not transfer any of the Divestiture Assets to any affiliate not regulated as a public utility by the CPUC.

## XI. *COMPLIANCE INSPECTION*

Only for the purposes of determining or securing compliance with the Final Judgment and subject to any legally recognized privilege, from time to time:

A. Duly authorized representatives of the Plaintiff, including consultants and other persons retained by the United States, upon written request of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendant made to their principal offices, shall be permitted:

1. Access during office hours of Defendant to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of Defendant, who may have counsel present, relating to enforcement of this Final Judgment; and

2. Subject to the reasonable convenience of Defendant and without restraint or interference from it, to interview, either informally or on the record, its officers, employees, and agents, who may have counsel present, regarding any such matters.

B. Upon the written request of the Assistant Attorney General in charge of the Antitrust Division made to Defendant's principal offices, Defendant shall submit

such written reports, under oath if requested, with respect to any matter contained in the Final Judgment.

C. No information or documents obtained by the means provided in Section VIII or Section XI of this Final Judgment shall be divulged by a representative of the Plaintiff to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the Plaintiff is a party, including grand jury proceedings, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by Defendant to Plaintiff, Defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then ten calendar days notice shall be given by Plaintiff to Defendant prior to divulging such material in any legal proceeding, other than a grand jury proceeding.

## XII. *RETENTION OF JURISDICTION*

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violations hereof.

## XIII. *TERMINATION AND MODIFICATION*

A. This Final Judgment will expire on the tenth anniversary of the date of its entry unless the Final Judgment is terminated pursuant to Section XIII(B); provided, however, the Final Judgment will terminate when the United States notifies Enova and the Court that Enova has provided to the United States documentation sufficient to prove (1) that the merger between Enova and Pacific identified in the Complaint has been terminated; or (2) that an Independent System Operator has assumed control of Pacific's gas pipelines within California in a manner satisfactory to the United States. The United States shall, in its sole discretion, determine whether the documentation proffered by Enova is sufficient.

B. After five years from the date it is entered, this Final Judgment shall terminate if Defendant demonstrates to the Court that (1) it no longer owns any of its existing nuclear assets, or (2) such assets are no longer in operation, or (3) the output of those nuclear assets is required by law or regulation to be sold at a fixed price.

C. Enova's obligation to divest an asset shall terminate if any governmental authority permanently revokes any license or permit necessary for the operation of such asset, properly exercises power or eminent domain with respect to such asset, or enters into a settlement agreement with Enova regarding the disposition of such asset to a third party.

D. Modification of Section V.

1. In the event that Defendant divests all of its existing nuclear generation assets, the total ownership capacity limit in Section V(B)(1) of this Final Judgment will increase to 800 MW; however, in no event shall the total ownership capacity limit in Section V(B)(1) exceed the greater of 500 MW or 10% of Defendant's total electricity retail sales.

2. In the event that Defendant's total retail electricity sales at any point exceed 8,000 MW capacity, the total capacity ownership limit in Section V(B)(1) of this Final

Judgment will be increased up to 10% of such retail electricity sales.

### XIV. *EFFECT OF REGULATORY APPROVALS*

The approvals by the United States required by this Final Judgment for sale of Divestiture Assets are in addition to the necessary approvals by the CPUC or any other governmental authorities for the sale of such assets.

### XV. *PUBLIC INTEREST*

Entry of this Final Judgment is in the public interest.